UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>RELATIVITY MEDIA, LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 18-11358 (MEW)<br><br>(Jointly Administered) |

**DECLARATION OF LORI SINANYAN IN SUPPORT OF
CHAPTER 11 PETITIONS, FIRST DAY PLEADINGS AND PROPOSED SALE**

I, Lori Sinanyan, hereby declare under penalty of perjury as follows:

1. I am the Chief Counsel at Relativity Media, LLC ("**Relativity Media**"), which is located at 9242 Beverly Blvd #300, Beverly Hills, CA 90210.

2. I graduated from the University of California, Los Angeles in 1997 with a B.S. in Political Science. I also earned a J.D. from the University of Southern California Law School in 2000.

3. I have over 17 years of experience in the restructuring sector. Prior to becoming Chief Counsel of Relativity in 2016, I served as (a) Of Counsel at Jones Day in Los Angeles from 2009-2016, (b) an Associate and then Partner at Kirkland & Ellis LLP in Los Angeles from 2002-2009 and (c) an Associate at Morgan, Lewis & Bockius LLP in Los Angeles from 2000-2002.

4. On May 3, 2018 (the "**Petition Date**"), each of the above-captioned debtors and debtors in possession (the "**Debtors**") filed a voluntary petition in this Court for relief under chapter 11 of the Bankruptcy Code.

---

[1] Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth (a) in the *Order (A) Authorizing the Joint Administration of their Chapter 11 Cases and (B) Waiving Requirements of Section 342(C)(1) of the Bankruptcy Code and Bankruptcy Rule 2002(n)* [Docket No. 5] and (b) at https://cases.primeclerk.com/relativity. The location of Relativity Media, LLC's corporate headquarters and the Debtors' service address is: 9242 Beverly Blvd #300, Beverly Hills, CA 90210.

5.  A detailed description of, among other things, the Debtors' capital and organizational structure and operations can be found in the *Declaration of Colin Adams in Support of Chapter 11 Petitions and First Day Pleadings* (the "**Adams Declaration**").

6.  Except as otherwise indicated, all statements set forth in this declaration (this "**Declaration**") are based upon: (a) my personal knowledge; (b) the Debtors' books and records; and (c) my opinion based upon my experience and knowledge of the Debtors' operations and financial conditions. If called upon to testify, I could and would testify to the facts set forth in this Declaration.

7.  I submit this Declaration in support of certain of the Debtors' requests for first day relief and the Debtors' request for approval of the sale of substantially all of the Debtors' assets to UltraV Holdings, LLC ("**UltraV**").

## The 2015 Bankruptcy

8.  On July 30, 2015, Relativity Fashion, LLC and 143 of its affiliates (the "**2015 Debtors**") filed petitions for relief under the Bankruptcy Code. On February 8, 2016, this Court entered an order (the "**2016 Confirmation Order**") confirming the *Plan Proponents' Fourth Amended Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, dated February 8, 2016 (as amended by the 2016 Confirmation Order, the "**2016 Plan**").[2] The 2016 Plan became effective on April 14, 2016 (the "**Effective Date**").[3]

9.  Pursuant to the 2016 Plan, the 2015 Debtors were required to, among other things, "undertake such Restructuring Transactions as may be necessary or appropriate to effect, in accordance with applicable non-bankruptcy law, a restructuring of the Debtors' or Reorganized Debtors' respective business or simplify the overall organizational structure of the Reorganized

---

[2] *See* Case No. 15-11989 at Docket Nos. 1572 and 1573.
[3] *See* Case No. 15-11989 at Docket No. 1766.

2

Debtors, including but not limited to resolving intercompany claims, all to the extent not inconsistent with any other terms of this Plan." *See* 2016 Plan at III.E.1.

10. In addition, the 2016 Plan provided that the proceeds of any equity raised would be used as a source for funding the 2016 Plan. *See Second Amended Disclosure Statement for Plan Proponents' Second Amended Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Case No. 15-11989 at Docket No. 1174] (the "**Disclosure Statement**") at IV.C ("Jim Cantelupe, of Summit Trail Advisors, LLC, has committed to work with the Debtors to raise up to $100.0 million of new equity to fund the Plan."); s*ee also* Plan at III.F ("The Debtors or Reorganized Debtors, as applicable, are authorized to execute and deliver any documents necessary or appropriate to obtain Cash for funding this Plan. All consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained through a combination of one or more of the following: (a) Cash on hand of the Debtors, including Cash from business operations, or distributions from Non-Debtor Affiliates; (b) proceeds of the sale of assets; (c) the Exit Funding; (d) the proceeds of any tax refunds and the RKA Causes of Action; (e) the proceeds of any equity raise; and (f) any other means of financing or funding that the Debtors or the Reorganized Debtors determine is necessary or appropriate.").

11. Pursuant to the Plan, Joseph Nicholas ("**Nicholas**") and Ryan Kavanaugh ("**Kavanaugh**") (i) became the officers and directors of Relativity Holdings LLC ("**Holdings**") and (ii) were authorized to select the directors for the boards of managers/directors of the direct and indirect subsidiaries of Holdings. *See* Plan at III.G.2. Nicholas resigned as co-chairman and co-CEO of Relativity Media on September 13, 2016 and effective as of December 31, 2016, forfeited his equity interest in Holdings.

3

12. This Declaration discusses the events that transpired after the 2015 Debtors emerged from bankruptcy, focusing on Relativity's[4] efforts to implement the 2016 Plan.

**Relativity's Efforts to Raise Debt and Equity**

13. At emergence, Relativity remained intact, with the exception of Relativity's unscripted television division, which was purchased by the Company's senior secured lenders as part of the 2015 Debtors' chapter 11 cases. The capital structure had been deleveraged by approximately $600 million. And as a result of the sale of the television division, and other cost-cutting measures implemented by the Company as part of the restructuring, the Company's overhead was reduced by approximately 66%.

14. The Company intended to raise $50 to $100 million of new common equity for general working capital purposes, various strategic growth initiatives across the Company and to fulfill its obligations in connection with the 2016 Plan. In addition, the Company sought new debt financing in the approximate amount of $150 million.

15. To reach these goals, the Company had a full-time employee dedicated to capital raise efforts. In addition, each of Kavanaugh and Nicholas dedicated their efforts to support the capital raise. These three individuals worked hand-in-hand with Houlihan Lokey Capital Inc. ("**Houlihan**"), which was engaged by the Company on April 6, 2016 as its exclusive placement agent in connection with the possible private placement of more than $100 million in equity or equity-linked securities involving the Company. Houlihan was authorized to act on a "best efforts" basis as the agent of the Company in the offering and placement of Holding's securities.

16. Pursuant to the engagement letter with Houlihan, if the Company, prior to June 30, 2016, received more than one bona fide term sheet for at least $50 million, the duration of the

---

[4] As used herein, "**Relativity**" or the "**Company**" means Relativity Media and its affiliates following the Effective Date of the 2016 Plan.

4

Houlihan engagement letter would automatically extend until Dec 31, 2016 and thereafter month-to-month. The Houlihan engagement letter was subsequently amended to provide that the term would expire on June 30, 2016 with month-to-month extensions thereafter unless terminated with 30 days' notice.

17.     On May 14, 2016, the Company's dataroom became fully operational. Also in May 2016, the Company engaged EMP Media Partners LLC and Aperture ("**EMP**") as co-arrangers of debt recapitalization in connection with a possible $100 million P&A/Ultimates revolver and an $85 million film library term loan.

18.     From April to June 2016, the Company and Houlihan prepared and finalized a management presentation ("**Equity Presentation**") related to the offering of common equity and other securities of Holdings. I am informed and believe that substantially all, if not all, of the potential equity investors that the Company and/or Houlihan engaged in discussions received a copy of the Equity Presentation. Additionally, the Company and EMP prepared a similar management presentation ("**Recapitalization Presentation**") that was provided to substantially all, if not all, of the potential financiers with whom the Company and/or EMP engaged.

19.     After Houlihan's informal resignation[5], in October 2016, the Company signed a Broker Dealer Services Agreement with Growth Capital Services and EMP Media Partners LLC for the private placement of the Company's debt or equity securities (the "**Offering**"). The services agreement was for a one-year term and provided that during this term, their services could include: (a) reviewing the client's financial condition, operations, competitive environment, prospects and related matters; (b) preparing an information package or confidential information memorandum; (c) identifying potential investors and interested parties; (d) preparing and

---

[5] Houlihan provided written notice on January 12, 2017 of their resignation effective as of February 11, 2017.

5

implementing a plan to engage in discussions with potential investors and interested parties; (e) coordinating and evaluating indications of interest and proposals regarding the Offering; and (f) providing such other financial advisory and investment banking services reasonably necessary to accomplish the foregoing.

20.     That same month, the Company started to work with Storyoscopic as an arranger to help facilitate introductions and potential investments.

21.     Following the Effective Date of the 2016 Plan through at least the fall of 2017, the Company and/or its various advisors engaged with a wide range of parties regarding a multitude of possible transactions, including: (i) for the equity raise, at least 32 high net worth individuals, companies and/or funds (of which at least 5 engaged in extensive discussions and/or diligence), (ii) for the debt recapitalization, at least 14 companies and/or funds, (iii) for a sale of the film library, at least 7 companies and/or funds, and (iv) for an investment in the film production slate, at least 3 companies.[6]

20.     Despite all these efforts, only one potential transaction led to an investment in the Company.  YuuZoo Corporation Limited and the Company signed a binding letter of intent on October 27, 2016 for an equity investment and content license agreement ("**Yuuzoo LOI**").  On November 25, 2016, YuuZoo issued a press release concerning the deal terms set forth in the Yuuzoo LOI, which included YuuZoo making a (a) $15 million equity investment in the Company on November 23, 2016 and (b) $35 million equity investment in the Company between January – June 2017.  The deal also included an additional possible investment of up to $100 million.

---

[6] These statistics are based on the Company's books and records and the knowledge of employees currently with the Company.  I am informed and believe that each of Kavanaugh and Nicholas had meetings and discussions with investors not included  herein.

21. On or around November 23, 2016, YuuZoo paid $2.5 million towards its initial investment[7]. However, shortly thereafter, YuuZoo breached the Yuuzoo LOI. In December 2016, in an attempt to salvage the transaction, the parties pivoted to a content acquisition and distribution agreement format with an equity investment thereafter. This arrangement, however, was never consummated. Despite the breach, the parties yet again resumed discussions concerning the deal between February and March 2017, but no deal emerged, and no further payments to the Company were made by YuuZoo.

22. Thus, despite all of these efforts, including but not limited to engagement of various professionals, dedication of an employee to equity / debt recapitalization efforts, direct involvement of the co-managers in the equity raise, discussions and negotiations with many parties including managing an extensive diligence process with several interested investors, the Company was unable to secure the debt or equity capital necessary to execute on its business plan after it reorganized in 2016. As a result of these efforts, industry participants have been and are well aware of the Company's assets and the opportunities they may present.

23. The value of the Debtors' existing film assets diminishes over time: as a picture ages and demand for it wanes, the value of the ownership and distribution rights decreases. Without the ability to develop or acquire new titles, it is my understanding that the Debtors' assets are decreasing in value by the day.

24. Accordingly, in early 2018, discussions turned to negotiating a path toward maximizing the value of the Company's remaining assets. Given the inability to raise new capital in the market, it became apparent that the only viable path was an arrangement with the Company's incumbent senior secured lender, UltraV. Based on the Debtors' inability to raise debt or equity

---

[7] This amount was used to pay down the RM Bidder Note.

7

to date, it appears that UltraV holds the fulcrum security and that there is no value available for any creditors junior to UltraV (including the holder of the RSL Note).

25. On February 26, 2018, Kavanaugh signed a restructuring support agreement with UltraV, providing the framework for the sale to UltraV the Debtors are now proposing.

**Relativity's Disputes with Netflix**

26. Relativity secured the first-ever pay TV output deal with Netflix, through their subscription video-on-demand ("**SVOD**") service, for up to $20 million per film. The Netflix rent-a-system was and is one of the main assets of Relativity. The equity raise and debt recapitalization was impacted almost immediately by Netflix's post-emergence (i) refusal to execute certain notices of assignment requested by Relativity, (ii) threatened release of *Masterminds* ("**MM**") and *The Disappointments Room* ("**TDR**") on its streaming service prior to their theatrical release, and (iii) protracted litigation over the course of approximately 15 months.

27. On May 10, 2016, Relativity obtained a preliminary ruling from the Bankruptcy Court compelling Netflix to execute such notices of assignment, subject to a final evidentiary hearing. After a 3-day expedited trial in May 2016, the Bankruptcy Court ruled in favor of Relativity on multiple, alternative grounds. The Bankruptcy Court found that Netflix had not acted in good faith in the contractual dispute between the parties. The Bankruptcy Court also determined that Netflix's positions amounted to an improper collateral attack on the 2016 Plan. Finally, the Bankruptcy Court denied Netflix's motion to compel arbitration of the dispute, ruling that the Bankruptcy Court had the authority and obligation to adjudicate Relativity's motion and to enforce the 2016 Plan and the 2016 Confirmation Order.

28. Netflix appealed the Bankruptcy Court's order and injunction to the U.S. District Court for the Southern District of New York, which (i) denied Netflix's motion for an emergency stay of the Bankruptcy Court's order and (ii) affirmed, in a decision issued from the bench

immediately after oral argument, the Bankruptcy Court's order in all respects. Netflix then appealed the district court's order to the United States Court of Appeal for the Second Circuit, which, on August 16, 2017, affirmed the Bankruptcy Court's order.

29. There is little question that the protracted litigation with Netflix impacted a major asset of the Company and impacted the equity and debt recapitalization efforts.

**Relativity's Accomplishments and Failures Since the Effective Date**

30. Since the 2015 Debtors emerged from bankruptcy, the Company has, among other things, (i) paid off in full its DIP and Ultimates loans as set forth in the Plan, (ii) released MM and TDR in September 2016 in accordance with the 2016 Plan after having to litigate with Netflix over the release of the films, (iii) entered into a production and advertising loan with Comerica Bank and North American Panda, LLC for up to $11 million in connection with MM (this loan did not close until September 2016 because of the litigation discussed above with Netflix) which was paid in full, (iv) paid off in full amounts owed to CIT (the production lender as set forth in the Plan), which included $11.4 million for TDR and $19.7 million for MM, (v) paid off in full $680,000 owed to Unifi as the bond insurer with respect to MM and TDR, (vi) paid down the Midcap library loan by approximately $32.5 million and extended the loan's maturity date (originally only a 1-year term) through July 2018, (vii) paid down approximately $13.8 million owed to Macquarie (the post-release lender as set forth in the Plan) and subsequently effectuated an orderly transition of 3 titles to Macquarie (*Lazarus*, *Woman in Black 2*, and *Beyond the Lights*), which resulted in a decrease of their outstanding loan by an additional $9 million, leaving a balance of approximately $4.8 million, (viii) obtained a mezzanine loan secured by MM for $4.94 million, which allowed the Company to preserve its ongoing business, which now has a balance of just under $1 million, (ix) continued paying residuals and participations payments over the last 2 years with respect to the Company's entire library, (x) continued uninterrupted servicing and distribution of nearly 70

9

library titles, which are owned by the Company and/or for the benefit of Midcap, Macquarie, or Vine (formerly Manchester), (xi) preserved its core group of development titles for future production, (xii) entered into license deals with third parties to fill slots required by the Company's contract with Netflix (filling 3 slots with films released in 2017), (xiii) settled or resolved various arbitrations and/or litigation, and (xiv) executed debt to equity conversions with Carat and YFE.

31.     The Company also (i) sold various assets and/or distribution rights (e.g., *The Crow*, *Animal Crackers*, *Fearless*, part of its music library, and interests in Relativity Education) to pay down RM Bidder, who also received $2.5 million from Yuuzoo before Yuuzoo backed out its signed LOI with the Company, (ii) assisted the Litigation Trust in handling claims objections in accordance with the 2016 Plan, (iii) transferred 2 titles (*Somnia* and *Kidnap*) to RKA for a decrease of its debt by $2.5 million, (iv) transferred 3 titles (*3:10 to Yuma*, *The Forbidden Kingdom*, and *The Bank Job*) to Vine/Verite in accordance with the 2016 Plan, (v) terminated other distribution deals (e.g. *The First Monday in May* (fka *Met Ball*), *Hunter Killer*, *Solace*, *Collide* and *Den of Thieves*) and (vi) slimmed down operations and overhead to maintain operations and accomplish many of the items listed above.

32.     Finally, the Company is engaging in ongoing negotiations with the Guilds to pay the residuals owing on MM and TDR.  To date, the Company has paid the Guilds approximately $6.6 million on account of the Guilds' secured claim under the 2016 Plan.  Additionally, the Company has deposited approximately $2.3 million over time in the secured Guild's trust account for secured residuals based on receipts for all titles collected since the 2015 Debtors emerged from bankruptcy.

33.     Although Relativity has had a number of successes since the 2015 Debtors emerged from bankruptcy, its inability to close on a recapitalization has resulted in the Company's inability to meet its financial obligations and ultimately resulted in this filing.

[signature page to follow]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:   May 8, 2018
         New York, New York

_____
Lori Sinanyan
Chief Counsel