**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| RELATIVITY MEDIA, LLC, *et al.*,[1] | Case No. 18-11358 (MEW) |
| Debtors. | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR DEBTORS' AND THE CREDITORS' COMMITTEE'S SECOND AMENDED JOINT LIQUIDATING PLAN UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF ANY CHAPTER 11 PLAN DESCRIBED HEREIN.  ACCEPTANCES OR REJECTIONS OF A CHAPTER 11 PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT HAS BEEN SUBMITTED FOR BANKRUPTCY COURT APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THE DEBTORS RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THIS PROPOSED DISCLOSURE STATEMENT AT OR BEFORE THE HEARING TO CONSIDER APPROVAL OF THIS DISCLOSURE STATEMENT.

Justin E. Rawlins (admitted *pro hac vice*)
Daniel J. McGuire (admitted *pro hac vice*)
Carrie V. Hardman
Aaron M. Gober-Sims (admitted *pro hac vice*)
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
Fax: (212) 294-4700

Scott F. Gautier (admitted *pro hac vice*)
Michael T. Delaney (admitted *pro hac vice*)
**ROBINS KAPLAN LLP**
399 Park Avenue, Suite 3600
New York, NY 10022
Tel: (212) 980-7400
Fax: (212) 980-7499

Dated: December 13, 2018

---

[1] Each of the Debtors in the above-captioned jointly administered chapter 11 cases and their respective tax identification numbers are set forth (a) in the *Order (A) Authorizing the Joint Administration of their Chapter 11 Cases and (B) Waiving Requirements of Section 342(C)(1) of the Bankruptcy Code and Bankruptcy Rule 2002(n)* [Docket No. 5] and (b) at https://cases.primeclerk.com/relativity.  The location of Relativity Media, LLC's corporate headquarters and the Debtors' service address is 9242 Beverly Blvd #300, Beverly Hills, CA 90210.

## <u>IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT</u>

On May 3, 2018 (the "**Petition Date**") Relativity Media, LLC and 57 of its direct and indirect subsidiaries (collectively, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors and the Creditors' Committee are providing you with the information in this disclosure statement (the "**Disclosure Statement**") because you may be a creditor of the Debtors and entitled to vote on the *Debtors' and the Creditors' Committee's Joint Liquidating Plan Under Chapter 11 of the Bankruptcy Code* [Docket No. 563] (as amended, modified or supplemented and including all exhibits and attachments, the "**Plan**").[2]

The Debtors and the Creditors' Committee (collectively, the "**Plan Proponents**") are providing the information in this Disclosure Statement to Holders of Claims or Interests for purposes of soliciting votes to accept or reject the Plan. Nothing in this Disclosure Statement may be relied upon or used by any Person or Entity for any other purpose. Before deciding whether to vote for or against the Plan, each Holder entitled to vote should carefully consider all of the information in this Disclosure Statement. This Disclosure Statement does not provide any legal, financial, securities, tax or business advice, and the Plan Proponents urge each Holder of a Claim or Interest to consult with their own advisors with respect to any legal, financial, securities, tax or business advice in reviewing the Disclosure Statement and the Plan.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan. However, the Plan Proponents reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019. Although the Plan Proponents believe that these summaries are fair and accurate, they are qualified in their entirety to the extent that they do not set forth the entire text of such documents, statutory provisions and financial information or every detail of such documents and provisions. In the event of any inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any documents incorporated herein by reference, the Plan or such other documents will govern for all purposes. Factual information contained in this Disclosure Statement has been provided by the Debtors' management except where otherwise specifically noted. No representations have been authorized by the Bankruptcy Court concerning the Debtors, their business operations or the value of their assets, except as explicitly set forth in this Disclosure Statement. The Plan Proponents do not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement and there can be no assurance that the statements contained herein will be correct at any time after this date. The information contained in this Disclosure Statement, including, among other things, the information regarding the history, businesses and operations of the Debtors and the financial information regarding the Debtors, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as admissions or stipulations. In contested matters and adversary proceedings, such information shall constitute statements made in settlement negotiations as part of the Debtors' attempt to settle and resolve their liabilities pursuant to the Plan. This Disclosure Statement will

---

[2] Except as otherwise provided herein, capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan.

not be admissible in any nonbankruptcy proceeding, nor will it be construed to be conclusive advice on the tax, securities or other legal effects of the Plan as to Holders of Claims against, or Interests in, the Debtors. Except where specifically noted, the financial information contained in this Disclosure Statement has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States.

This Disclosure Statement was prepared to provide parties in interest in the Chapter 11 Cases with "adequate information" (as defined in section 1125 of the Bankruptcy Code), so that creditors who are entitled to vote to accept or reject the Plan may make informed decisions regarding such votes. The Plan Proponents believe that the Plan is in the best interests of the Debtors' creditors and other stakeholders. All creditors entitled to vote on the Plan are urged to vote in favor of the Plan. A summary of the voting instructions is set forth in Article I.D of this Disclosure Statement. More detailed instructions are contained on the Ballots distributed to the creditors entitled to vote on the Plan. **To be counted, your Ballot must be duly completed, executed and actually received by Prime Clerk LLC (the "Voting Agent") by 4:00 p.m. (Eastern Time), on January ___, 2019 (the "Voting Deadline"), unless the Voting Deadline is extended by the Plan Proponents or the Bankruptcy Court.**

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtors and projections about future events and financial trends affecting the financial condition of the Debtors' businesses and assets. The words "believe," "may," "estimate," "continue," "anticipate," "intend," "expect" and similar expressions identify these forward-looking statements. These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described in Article XI of this Disclosure Statement. In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur and actual results could differ materially from those anticipated in the forward-looking statements. The Plan Proponents do not undertake any obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events or otherwise.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and not necessarily in accordance with federal or state securities laws or other nonbankruptcy laws. This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "**SEC**"), any state securities commission or any securities exchange or association. Nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

| QUESTIONS AND ADDITIONAL INFORMATION |
|---|

If you would like to obtain copies of this Disclosure Statement, the Plan or any of the documents attached hereto or referenced herein, or if you have questions about the solicitation and voting process or the Chapter 11 Cases generally, please contact the Voting Agent by either (i) visiting https://cases.primeclerk.com/relativity (the "**Document Website**") or (ii) calling (866) 355-3940 (for domestic or Canadian callers) or (323) 406-6362 (for international callers).

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ............................................................................................... 1

    A.     Brief Overview of the Plan ....................................................................... 1
    B.     Parties Entitled to Vote on the Plan .......................................................... 1
    C.     Solicitation Packages ................................................................................ 3
    D.     Ballots, Voting Procedures and Voting Deadline ...................................... 3
    E.     Plan Objection Deadline ........................................................................... 4
    F.     Confirmation Hearing ............................................................................... 5

II.    OVERVIEW OF THE DEBTORS ..................................................................... 5

    A.     Corporate Structure .................................................................................. 5
    B.     Business Overview .................................................................................... 5
    C.     Business Operations .................................................................................. 6
    D.     Equity Classes .......................................................................................... 6
    E.     Prepetition Capital Structure ..................................................................... 7
    F.     Events Leading to Chapter 11 Cases ....................................................... 14

III.   THE CHAPTER 11 CASES ............................................................................. 18

    A.     Voluntary Petitions ................................................................................. 18
    B.     First and Second Day Motions ................................................................ 18
    C.     Retention of the Debtors' Professionals .................................................. 19
    D.     The Creditors' Committee ....................................................................... 19
    E.     Other Motions in the Chapter 11 Cases .................................................. 20

IV.    THE PLAN ....................................................................................................... 27

V.     CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ........... 29

    A.     Unclassified Claims ................................................................................ 30
    B.     Classified Claims and Interests ............................................................... 32
    C.     Treatment of Classified Claims and Interests .......................................... 33
    D.     Special Provision Governing Unimpaired Claims .................................... 35
    E.     Elimination of Vacant Classes ................................................................ 35
    F.     Acceptance or Rejection of the Plan ........................................................ 35
    G.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the
          Bankruptcy Code .................................................................................... 36
    H.     Subordinated Claims ............................................................................... 36
    I.      Controversy Concerning Impairment ...................................................... 36
    J.      Procedures for Resolving Contingent, Unliquidated and Disputed
          Claims .................................................................................................... 36

VI.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
       LEASES ........................................................................................................... 38

    A.     Assumption and Rejection of Executory Contracts and Unexpired
          Leases .................................................................................................... 38
    B.     Directors and Officers Insurance Policies ................................................ 39

i

# TABLE OF CONTENTS
(continued)

|  |  |  | Page |
|---|---|---|---|
| | C. | Claims Based on the Rejection of Executory Contracts or Unexpired Leases | 39 |
| | D. | Cure of Defaults for Executory Contracts and Unexpired Leases Assumed | 39 |
| | E. | Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases | 40 |
| | F. | Modifications, Amendments, Supplements, Restatements or Other Agreements | 40 |
| | G. | Reservation of Rights | 41 |
| | H. | Nonoccurrence of Effective Date | 41 |
| VII. | | SUBSTANTIVE CONSOLIDATION | 41 |
| VIII. | | VOTING REQUIREMENTS | 42 |
| | A. | Voting Deadline | 42 |
| | B. | Holders Entitled to Vote | 43 |
| | C. | Vote Required for Acceptance by a Class | 43 |
| IX. | | CONFIRMATION OF THE PLAN | 44 |
| | A. | Requirements for Confirmation of the Plan | 44 |
| | B. | Alternatives to Confirmation and Consummation of the Plan | 49 |
| X. | | MEANS OF IMPLEMENTATION | 49 |
| | A. | Conditions to Plan Effectiveness | 49 |
| | B. | Waiver of Conditions | 50 |
| | C. | Effect of Failure of Conditions | 50 |
| | D. | Corporate Action | 51 |
| | E. | Vesting of Assets | 51 |
| | F. | Dissolution of the Debtors; Termination of Current Officers, Directors, Employees and Counsel | 51 |
| | G. | Liquidating Trust | 51 |
| | H. | Provisions Governing Distributions | 53 |
| | I. | Exculpation | 56 |
| | J. | Injunction | 57 |
| | K. | Term of Injunctions or Stays | 58 |
| | L. | Miscellaneous Provisions | 58 |
| XI. | | RISK FACTORS | 62 |
| | A. | Claim Objections | 62 |
| | B. | Distributions | 63 |
| | C. | Non-Confirmation of Plan | 63 |
| | D. | Administrative Insolvency | 63 |
| | E. | Amendment, Waiver, Modification or Withdrawal of Plan | 64 |
| | F. | Non-Occurrence or Delayed Occurrence of the Effective Date | 64 |
| | G. | Conversion to Chapter 7 Case | 64 |

## TABLE OF CONTENTS
(continued)

Page

XII.    **FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF
THE PLAN** ....................................................................................................... **64**

    A.    Certain United States Federal Income Tax Consequences to the Debtors............ 65

    B.    Consequences to Holders of Certain Claims ........................................................ 66

XIII.    **RECOMMENDATION AND CONCLUSION** ........................................................... **68**

**TABLE OF EXHIBITS**

| | |
|---|---|
| **Exhibit A** | **The Plan** |
| **Exhibit B** | **The Wind Down Budget** |
| **Exhibit C** | **The Liquidation Analysis** |

## I.    INTRODUCTION

The Plan Proponents submit this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code in connection with the solicitation of acceptances of the Plan.  A copy of the Plan is attached hereto as **Exhibit A**.  The rules of interpretation set forth in Article I.B of the Plan shall govern the interpretation of this Disclosure Statement.

This Disclosure Statement sets forth certain information regarding the prepetition operating and financial history of the Debtors, the events leading up to the commencement of the Chapter 11 Cases, events that have occurred during the Chapter 11 Cases and the anticipated liquidation of the Debtors if the Plan is confirmed and becomes effective.  This Disclosure Statement also describes terms and provisions of the Plan, including, among other things, certain effects of confirmation of the Plan, certain risk factors, certain alternatives to the Plan and the manner in which Distributions will be made under the Plan.

The Plan establishes the Liquidating Trust, which will, among other things, undertake the liquidation of the Debtors and their Estates, administer Distributions in accordance with the Plan and the Liquidating Trust Agreement and prosecute or otherwise resolve the Retained Causes of Action.  The Plan Proponents believe that the Plan is in the best interest of the Debtors' creditors and stakeholders.  On [_____], 2018, the Bankruptcy Court entered an order approving this Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code.  *See* Docket No. [_].  **However, the Bankruptcy Court's approval of the Disclosure Statement constitutes neither a guaranty of the accuracy or completeness of the information contained herein nor an endorsement of the merits of the Plan**.

### A.    Brief Overview of the Plan

As discussed in more detail below, the Debtors' assets have been almost fully liquidated and few assets remain, the Plan contemplates a liquidation of the Debtors remaining intangible assets and their Estates.  There are no practical alternatives to the conclusion of this process.  The Plan's primary objective is to maximize the value of recoveries to all Holders of Allowed Claims and distribute all property of the Estates that is or becomes available for Distribution in accordance with the priorities established by the Bankruptcy Code.  The Plan Proponents believe that implementation of the Plan is in the best interests of each of the Debtors and their creditors.  For the reasons discussed in this Disclosure Statement, the Plan Proponents urge you to return your Ballot accepting the Plan to the Voting Agent by the Voting Deadline.

### B.    Parties Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a plan.  Creditors or equity interest holders whose claims or interests are not impaired by a plan are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and are not entitled to vote.  In addition, creditors or equity interest holders whose claims or interests are impaired by a plan and will receive no distribution under the plan are not entitled to vote because they are deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code.  These matters are more fully discussed in Article V.B of this Disclosure Statement.

The following table identifies the Classes that are entitled to vote on the Plan. The table also sets forth the estimated Allowed amount for each Class, the estimated recovery for each Class and the impairment status for each Class. Article V.C of this Disclosure Statement contains a detailed description of the Classes of Claims and Interests.

| Class | Designation | Impairment | Estimated Allowed Amount[3] | Estimated Recovery Rate[4] | Voting Status |
|-------|-------------|------------|------------------------------|------------------------------|---------------|
| 1 | Secured Tax Claims | Unimpaired | $0.00-$90,433.11 | 100% | Deemed to accept the Plan and not entitled to vote. |
| 2 | Other Secured Claims | Unimpaired | $0.00[5] | 100% | Deemed to accept the Plan and not entitled to vote. |
| 3 | Other Priority Claims | Unimpaired | $0.00-$772,744.37 | 100% | Deemed to accept the Plan and not entitled to vote. |
| 4 | General Unsecured Claims | Impaired | $50,000,000 - $307,000,000 | .02 – 5%[6] | Entitled to vote on the Plan. |
| 5 | Intercompany Claims | Impaired | N/A | 0% | Deemed to reject the Plan and not entitled to vote. |

---

[3] The Estimated Allowed Amounts are estimates only and actual amounts may be materially greater or less than those set forth herein. Such estimates account solely for the amounts either listed in the Debtors' schedules (the low end of any ranges provided) or the amounts listed in creditors' asserted proofs of claim, whichever is greater, and do not yet account for additional analysis including, without limitation, any amounts attributable to a deficiency claim or priority tax claim, or otherwise analyzed for the validity, extent, or priority of such claim. The Debtors may amend these figures on account of such further analysis.

[4] The Estimated Recovery Rates are estimates only and actual recoveries may be materially greater or less than those set forth herein. Such estimates do not yet account for additional analysis including, without limitation, any amounts attributable to a deficiency claim or otherwise analyzed for the validity, extent, or priority of such claim. The Debtors may amend these figures on account of such further analysis.

[5] As a result of the Sale, there is no collateral remaining to secure the liens or claims held by Holders of Other Secured Claims, thereby rendering such Claims wholly unsecured deficiency claims. While certain Holders of such Claims may continue to have recourse as against the Purchaser pursuant to the Asset Purchase Agreement or the Sale Order, as to the Debtors' Estates and the Plan, such deficiency claims are entitled to vote on the Plan as members of Class 4, *i.e.*, General Unsecured Claim.

[6] The Estimated Recovery Rates for Class 4 derive from the Committee and Debtors' current assessment of the amount of potentially available assets and the pool of claims that are likely to be allowed. The Liquidating Trustee would need to bring in significant value through the prosecution of Retained Causes of Action to achieve anywhere near the higher end of the estimate.

| 6 | Interests | Impaired | N/A | 0% | Deemed to reject the Plan and not entitled to vote. |
|---|---|---|---|---|---|

### C.    Solicitation Packages

On ____, 2018, the Bankruptcy Court entered an order approving *Debtors' Motion for Entry of an Order (I) Approving the Adequacy of the Disclosure Statement, (II) Approving the Solicitation and Notice Procedures with Respect to Confirmation of Debtors' and the Creditors' Committee's Joint Plan of Liquidation, (III) Approving the Forms of Ballots and Notices in Connection Therewith, (IV) Scheduling Certain Dates with Respect Thereto and (V) Granting Related Relief. See* Docket No. [_] (the "**Disclosure Statement Order**"). The package of materials (the "**Solicitation Package**") to be sent to Holders in the Voting Class includes:

a.    this Disclosure Statement (with the Plan as an exhibit thereto);

b.    the Solicitation and Voting Procedures;

c.    the notice of the Confirmation Hearing (the "**Confirmation Hearing Notice**");

d.    the Class 4 Ballot(s) with voting instructions with respect thereto;

e.    a cover letter from the Debtors;

f.    the Disclosure Statement Order; and

g.    any supplemental documents that the Debtors file with the Bankruptcy Court or that the Bankruptcy Court orders to be made available.

In addition to the service procedures outlined above: (a) the Plan, the Disclosure Statement and the exhibits to both of the foregoing documents will be made available online at no charge at the Document Website and (b) the Plan Proponents will provide parties in interest (at no charge) with hard copies of the Plan and/or Disclosure Statement upon written request to *Relativity Media Ballots*, c/o Prime Clerk LLC, 830 3rd Avenue, 3rd Floor, New York, NY 10022.

### D.    Ballots, Voting Procedures and Voting Deadline

If you are entitled to vote to accept or reject the Plan, a Ballot has been enclosed in your Solicitation Package for the purpose of voting on the Plan. If you hold multiple Claims, you may receive more than one Ballot. In voting to accept or reject the Plan, you must use only the Ballot or Ballots sent to you with this Disclosure Statement. After carefully reviewing the Plan, the Disclosure Statement, the Disclosure Statement Order and the detailed instructions accompanying your Ballot, please indicate on your Ballot your vote to accept or reject the Plan.

All Ballots, in order to be counted, must be properly completed in accordance with the voting instructions on the Ballot and **actually received** by the Voting Agent by the Voting Deadline (i.e., [____], 2019 at 4:00 p.m. (Eastern Time)). Please return your properly completed Ballot(s) to *Relativity Media Ballots,* c/o Prime Clerk LLC, 830 3rd Avenue, 3rd Floor, New York, NY 10022. Ballots should not be sent directly to the Debtors, the Creditors' Committee or the foregoing parties' agents (other than the Voting Agent).

In addition to accepting Ballots by regular mail, overnight courier or hand delivery, Ballots will be accepted via electronic, online transmission through a customized electronic Ballot by utilizing the E-Ballot platform on Prime Clerk's website. Holders may cast an E-Ballot and electronically sign and submit such electronic Ballot via the E-Ballot platform. Instructions for casting an electronic Ballot can be found on the "E-Ballot" section of Prime Clerk's website. The encrypted ballot data and audit trail created by such electronic submission shall become part of the record of any electronic Ballot submitted in this manner and the creditor's electronic signature will be deemed to be an original signature that is legally valid and effective. For the avoidance of doubt, holders may only cast Ballots electronically via the E-Ballot platform (https://cases.primeclerk.com/relativity). Ballots submitted by electronic mail, facsimile, or any other means of electronic submission other than E-Ballot will not be counted.

If a Holder of a Claim delivers to the Voting Agent multiple properly completed Ballots with respect to a Claim prior to the Voting Deadline, the Ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the properly completed Ballot determined by the Voting Agent to have been received last from such Holder with respect to such Claim.

If you are a Holder of a Claim who is entitled to vote on the Plan as set forth in the Disclosure Statement Order and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the Disclosure Statement, the Plan, your Ballot or the Solicitation and Voting Procedures, please contact the Voting Agent (a) by telephone at (866) 355-3940 (for domestic or Canadian callers) or (323) 406-6362 (for international callers), (b) by email at relativityballots@primeclerk.com, or (c) in writing at *Relativity Media Ballots*, c/o Prime Clerk LLC, 830 3rd Avenue, 3rd Floor, New York, NY 10022.

Before voting on the Plan, each Holder in the Voting Class should read the following documents in their entirety: the Disclosure Statement, the Plan, the Disclosure Statement Order, the Confirmation Hearing Notice and the instructions accompanying their Ballot(s). These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated. Holders of Claims in the Voting Class are also encouraged to review the relevant provisions of the Bankruptcy Code and Bankruptcy Rules and/or consult their own attorneys. Article VIII.D of this Disclosure Statement contains further information and instructions on voting to accept or reject the Plan.

### E.    **Plan Objection Deadline**

Pursuant to the Disclosure Statement Order, objections to Confirmation or requests for modifications to the Plan, if any, must: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules and any orders of the Court; (c) state, with particularity, the legal and factual basis for

the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the applicable notice parties so to be actually received on or before [_____], 2019 at 4:00 p.m. (Eastern Time) (the "**Plan Objection Deadline**").

### F.   Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the Debtors have fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code. The Confirmation Hearing has been scheduled for [_____], 2019 at [__:__] [a][p].m. (Eastern Time) before the Honorable Judge Michael E. Wiles, United States Bankruptcy Judge for the Southern District of New York, in Courtroom 617 at the United States Bankruptcy Court for the Southern District of New York, located at One Bowling Green, New York, NY 10004. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice.

## II.   OVERVIEW OF THE DEBTORS

### A.   Corporate Structure

The Debtors operate their businesses through separate but affiliated companies that are generally organized by business lines or units. Relativity Holdings LLC ("**Relativity Holdco**") owns 100% of the equity of Relativity Media, LLC ("**RML**") and RML is the direct or indirect owner of the Debtors (the "**Debtor Subsidiaries**") and the non-Debtor subsidiaries of Relativity Holdco (the "**Non-Debtor Subsidiaries**" and, together with Relativity Holdco, RML and the Debtors, "**Relativity**" or the "**Company**"). Detailed charts of Relativity's corporate structure by legal entity are attached as **Exhibit C** to the *Declaration of Colin M. Adams in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 7].

### B.   Business Overview

Relativity is a privately held entertainment company with a global media platform that historically has provided, among other things, film financing, production and distribution. Relativity was founded in 2004 as a film slate co-financier partnering with major studios such as Sony and Universal. In 2010, Relativity acquired the marketing and distribution operations of Overture Films, LLC and began to transform itself into a full-service movie studio. Since its inception, Relativity has produced, distributed or structured financing for over 200 feature films, including films such as *The Fighter*, *Limitless*, *Safe Haven* and *Act of Valor*. Prior to its 2015 Bankruptcy (defined below), Relativity had further expanded into other forms of business, including branding services, sports management, digital media, music publishing and fashion brand management and consultation.

On July 30, 2015, Relativity Fashion, LLC and 143 of its affiliates (the "**2015 Debtors**") filed petitions for relief under the Bankruptcy Code in the Bankruptcy Court (the "**2015 Bankruptcy**"). On February 8, 2016, the Bankruptcy Court entered an order (the "**2016 Confirmation Order**") confirming the *Plan Proponents' Fourth Amended Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, dated February 8, 2016 (as amended by the 2016

Confirmation Order, the "**2016 Plan**").[7]  The 2016 Plan became effective on April 14, 2016 (the "**2016 Plan Effective Date**").[8]

As discussed in the *Declaration of Lori Sinanyan in Support of Chapter 11 Petitions, First Day Pleadings and Proposed Sale* [Docket No. 8], the 2016 Plan did not result in a successful going business enterprise.  Following the 2016 Plan Effective Date, Relativity was unable to raise the capital that it required and the size and scope of Relativity's business operations were severely curtailed.  By May 8, 2018, the Debtors' work force had been reduced to approximately 11 full and part-time employees and five (5) independent contractors.

### C.    Business Operations

The Debtors no longer conduct any ongoing business operations except as necessary to maintain assets for distribution to creditors through this Plan.  Relativity is headquartered at 9242 Beverly Boulevard, Suite 300, Beverly Hills, California 90210.  The premises are leased.  Relativity's operations were previously conducted through various subsidiaries and affiliates that are grouped by business units.  The Debtors' key business units historically have included (a) film distribution; (b) music; (c) digital; (d) branding; and (e) fashion.  Presently, the Debtors' business activities are almost exclusively related to a subset of its historical film business.

In the past, Relativity's film business provided a full-service studio with development, financing and distribution capabilities.  As of the Petition Date, however, Relativity's operations had been reduced to four (4) primary business activities:  (a) the ongoing exploitation of approximately 70 titles from its film library; (b) servicing the film library; (c) distributing owned and third-party first-run film content through Netflix, Inc. ("**Netflix**") pursuant to an existing subscription video-on-demand distribution agreement; and (d) preserving and marketing film, television, music and other content assets and intellectual property for monetization and/or future development.   Currently, Relativity has no ongoing business activities as Relativity sold substantially all of its assets to UltraV and certain affiliates of UltraV (collectively, the **Purchaser**") pursuant to the asset purchase agreement dated as of October 10, 218 (the "**Asset Purchase Agreement**") that the Bankruptcy Court approved on August 21, 2018.  *See* Docket Nos. 502, 553.

### D.    Equity Classes

Relativity Holdco's operating agreement establishes three (3) classes of equity units: (a) Class A Common Units, (b) Preferred Units and (c) Profits Interest Units.  Profits Interest Units are nonvoting.  As noted in Article II.A of this Disclosure Statement, the Debtors and the Non-Debtor Subsidiaries are 100% owned by Relativity Holdco.  As of December 31, 2017, Relativity Holdco's operating agreement lists the ownership of the units as follows:

---

[7] *See* Case No. 15-11989 at Docket Nos. 1572 and 1573.
[8] *See* Case No. 15-11989 at Docket No. 1766.

| Member | Class | Number | Percentage Interest |
|---|---|---|---|
| RKRML Holdings Inc. | Preferred | 10,298,803 | 9.77% |
| | Class A Common | 57,322,954 | 54.40% |
| Carat USA, Inc. | Class A Common | 13,168,000 | 12.5% |
| YFE Holdings, Inc. | Class A Common | 21,070,000 | 20.0% |
| Dana Brunetti and Management | Special Preferred Profits Interests | 3,508,772 | 3.33% |
| **Total Issued and Outstanding Units** | | **105,368,529** | **100.00%** |

### E. <u>Prepetition Capital Structure</u>

The following table reflects a summary of the Debtors' pre-petition secured indebtedness. The table is broken down by recourse (obligations, either primary or secondary, of RML and various other operating entities) and non-recourse (obligations solely of special purpose vehicles).

| **Recourse Corporate Debt** | **Actual Amount ($ thousands) Calculated as of 5/3/2018** |
|---|---|
| Prepetition Secured Note | 73,597.00 |
| Subordinated Convertible Note | 44,795.00 |
| Heatherden Securities LLC Fee Claim Notes | 5,869.00 |
| Technicolor Note | 7,922.00 |
| **Total Recourse Corporate Debt** | **129,577.00** |

| **Non-Recourse Corporate Debt** | |
|---|---|
| **Counterparty** | **Actual Amount ($ thousands)** |
| Midcap Library Facility | 17,140.00 |
| Class D Replacement Funding Agreement | 4,949.00 |
| Aperture Obligations | 974.00 |
| Replacement P&A Notes | 99,440.00 |
| **Total Non-Recourse Corporate Debt** | **130,883.00** |

1.     *Recourse Corporate Debt*

a.     <u>*Prepetition Secured Note Facility*</u>

Pursuant to the terms of the 2016 Plan, (i) RML, as maker, (ii) the Guarantors (as defined therein and, collectively, the "**Prepetition Note Guarantors**"), and (iii) RM Bidder, LLC, as payee (which has assigned all of its rights, title and interest in the Prepetition Secured Note to UltraV, together with its successors and assigns, collectively, the "**Prepetition Secured Note Lender**"), entered into that certain Secured Promissory Note in the aggregate principal amount of $60,000,000, which is referred to in the 2016 Plan as the "Bidco Note" (as amended, modified or supplemented, the "**Prepetition Secured Note**" and, together with all security agreements, pledge agreements and other documents executed and delivered in connection therewith, including, without limitation, the other Note Documents (as defined in the Prepetition Secured Note), each as amended, modified, or otherwise supplemented, collectively, the "**Prepetition Secured Note Documents**").

Pursuant to the Prepetition Secured Note Documents, the Debtors granted to the Prepetition Secured Note Lender a security interest in, and liens on, all or substantially all of the Debtors' assets, including, without limitation, the Collateral (as defined in the Prepetition Secured Note Documents) and all proceeds and products of any and all of the foregoing. The Prepetition Secured Note originally bore interest at a rate of 8.5% per annum on the first $30 million and 12.0% per annum on any amount over $30 million, in each case payable quarterly in cash. As part of the First Amendment to the Prepetition Secured Note, dated June 30, 2016, interest was raised to 12% per annum on the first $30 million and 15.5% per annum on any amount over $30 million. Since June 30, 2016, interest on the Prepetition Secured Note has been paid in kind. Obligations (as defined in the Prepetition Secured Note) under the Prepetition Secured Note are subject to mandatory repayment out of certain debt and equity raises and are required to be senior to certain other indebtedness of the Debtors.

As of the Petition Date, the Debtors were jointly and severally liable for amounts outstanding under the Prepetition Secured Note of not less than $73,597,000, which does not include any additional accrued and unpaid interest (including any default interest) after the Petition Date, fees, costs, expenses (including, without limitation, the reasonable and documented fees and expenses required to be paid under the Prepetition Secured Note Documents), payment-in-kind obligations, indemnities, costs, other charges or amounts owing under or in connection with the Prepetition Secured Note Documents and all other Obligations (the interest, fees and other expenses, collectively, the "**Prepetition Secured Note Obligations**"). Pursuant to the terms of the Prepetition Secured Note, each Prepetition Note Guarantor has jointly and severally guaranteed payment of the Prepetition Secured Note Obligations.

b.     <u>*Subordinated Convertible Note in Favor of Relativity Secured Lender, LLC*</u>

On April 12, 2016, RML issued that certain Subordinated Promissory Note and Security Agreement in favor of Relativity Secured Lender, LLC in the original principal amount of $35,000,000 (the "**RSL Note**"). As of the Petition Date, approximately $44,795,000 remained outstanding on the RSL Note. No payments have been made on the RSL Note. The obligations

under the RSL Note bear interest at 12% per annum and mature on April 12, 2021. The RSL Note is subordinated in right of payment to the Prepetition Secured Note Obligations and secured by substantially all of the assets of RML, subordinated to liens securing the Prepetition Secured Notes. Each of the Prepetition Note Guarantors guarantees the payment of the RSL Note.

The RSL Note includes an option, exercisable prior to the maturity date but subject to the occurrence of certain conditions (including that the Prepetition Secured Note Obligations are less than $30,000,000), for Relativity Secured Lender, LLC to require its redemption in exchange for a formula based amount of RML's equity interests. This option was not exercised before the Petition Date. Moreover, because the collateral securing the RSL Note was sold by the Debtors as described herein, the RSL Note Claim is treated as a General Unsecured Claim under the Plan.

Relativity Secured Lender, LLC and the Plan Proponents are currently attempting to negotiate of whatever claims Relativity Secured Lender, LLC, and its principals, on the one hand, and the Debtors and their estates, on the other hand, may have against each other. If an agreement is reached, the Plan Proponents anticipate filing a motion seeking approval of that compromise prior to the Voting Deadline.

c.    *Heatherden Securities LLC Fee Claim Notes*

Pursuant to the 2016 Plan, RML and each of the Prepetition Note Guarantors issued Heatherden Securities, LLC two (2) Unsecured Promissory Notes (Non-Negotiable) on April 14, 2016 (the "**Fee Claim Notes**"). Each such note was issued in the original principal amount of $2,875,000. One note has a maturity date of October 17, 2016; the other has a maturity date of February 17, 2017. Each note bears interest at 1% per annum. Each note was the product of a settlement under the 2016 Plan with Heatherden related to the Heatherden Fee Claim (as defined in the 2016 Plan). All obligations under each Fee Claim Note are guaranteed by each of the Prepetition Note Guarantors. As of the Petition Date, approximately $5,869,000 remained outstanding on these notes in the aggregate.

d.    *Technicolor Note*

On April 14, 2016, RML issued to Technicolor, Inc., a Delaware corporation ("**Technicolor**"), a Promissory Note in the original principal amount of $8,382,744.68 (the "**Technicolor Note**"). The Technicolor Note, which matured on April 14, 2018, required RML to make 24 monthly principal payments in the amount of $349,281.03. The Technicolor Note bore interest at 0% per annum unless an Event of Default (as defined in the Technicolor Note) occurred, after which interest accrued at the lesser of 10.5% per annum and the highest rate allowed by law. Pursuant to that certain Guaranty dated as of April 14, 2016 (the "**Technicolor Guaranty**"), Skyland (Beijing) Film-Television Culture Development Ltd., RML Distribution Domestic, LLC, a California limited liability company ("**RDD**"), and RML Distribution International, LLC, a California limited liability company ("**RDI**") (collectively, the "**Technicolor Guarantors**") each guaranteed RML's payment to Technicolor of the obligations under the Technicolor Note.

The Technicolor Note and the Technicolor Guaranty are each secured by a Services Lien and a Statutory Lien (in each case, as defined in the Technicolor Note) that are memorialized by that certain Security Agreement, dated as of April 14, 2016, by and among RML, each of the

9

Technicolor Guarantors and Technicolor. After making several initial cash payments, the monthly amortization payments contemplated by the Technicolor Note were not made. Nevertheless, Technicolor did not declare a default rendering the Technicolor Note's default rate inapplicable. Thus, approximately $7,922,000 remained outstanding under the Technicolor Note as of the Petition Date. The Asset Purchase Agreement provides that Technicolor shall not be required to turn over collateral to which it has a Permitted Exception (as defined in the Asset Purchase Agreement, and Technicolor has a Permitted Exception for the Services Lien and the Statutory Lien.

### 2. *Non-Recourse Corporate Debt*

#### a. <u>Library Term Loan</u>

On April 12, 2016, each of RMLDD Financing, LLC, a California limited liability company ("**RMLDD**"), RDD, RDI, and certain special purpose entities,[9] in each case as borrowers, certain financial institutions as lenders and Midcap Funding X Trust, a Delaware statutory trust, as Agent for the Lenders ("**Midcap**"), entered into that certain First Amendment to the Term Loan and Security Agreement (the "**Midcap Facility Loan Agreement**") dated as of March 11, 2016 (the "**Midcap Library Facility**"). RML serves as servicer for the borrowers under the Midcap Library Facility. The Midcap Library Facility was extended in one term loan advance in the amount of $40,000,000. Interest accrued on the obligations outstanding under the Midcap Library Facility at a stated rate of LIBOR plus 10% per annum.[10] Obligations under the Midcap Library Facility mature on July 12, 2018 and are amortized on a regular basis via cash sweep as cash proceeds from Pledged Pictures (as defined in the Midcap Facility Loan Agreement), net of certain costs, including residuals, are collected. As of the Petition Date, approximately $17,140,000 in obligations were outstanding on the Midcap Library Facility.

#### b. <u>Class D Replacement Funding Agreement</u>

The Debtors financed their print and advertising ("**P&A**") budgets, which are triggered when a film finishes production and moves into the post-production stage. Upon theatrical release, their post-release lender lent two times (2x) opening weekend box office. This obligation would normally have been paid off by an ultimates facility approximately 6-8 weeks after theatrical release. However, due to the 2015 Bankruptcy, loans outstanding on three (3) pictures remained unpaid. Upon the 2016 Plan Effective Date, certain of the 2015 Debtors were obligated to certain lenders with respect to *The Lazarus Effect*, *The Woman in Black 2: Angel of Death*, and *Beyond the Lights* (collectively, the "**Designated Pictures**"), for which the borrowers were, respectively:

---

[9] The special purpose entities which are borrowers under the Midcap Library Facility are 21 & Over Productions, LLC, 3 Days to Kill Productions, LLC, RML Acquisitions IV, LLC, RML Acquisitions IX, LLC, RML Acquisitions III, LLC, Best of Me Productions, LLC, Black or White Films, LLC, Brick Mansions Acquisitions, LLC, RML Desert Films, LLC, Don Jon Acquisitions, LLC, RML Echo Films, LLC, RML Acquisitions V, LLC, RML Turkeys Films, LLC, RML Hector Films, LLC, RML Acquisitions II, LLC, RML Acquisitions VI, LLC, RML Acquisitions II, LLC, Snow White Productions, LLC, Movie Productions, LLC, RML Acquisitions V, LLC, RML November Films, LLC, RML Oculus Films, LLC, Furnace Films, LLC, Paranoia Acquisitions, LLC, Safe Haven Productions, LLC, Malavita Productions, LLC, RML Acquisitions XI, LLC and RML Acquisitions I, LLC.

[10] As a consequence of a requested extension of the maturity date of the Midcap Library Facility, the facility presently accrues interest at a rate of 15% per annum.

RML Lazarus Films, LLC (the "**Lazarus Borrower**")[11] in the amount of $7,734,893.22; RML WIB Films, LLC (the "**WIB Borrower**") in the amount of $13,560,973.67; and Blackbird Productions, LLC (the "**BTL Borrower**") in the amount of $4,089,015.77.

To restate these obligations, on April 12, 2016, (a) the Lazarus Borrower, (b) the WIB Borrower, (c) the BTL Borrower, (d) RDD, as accommodation pledger, (e) RMLDD, as accommodation pledger, (f) Macquarie US Trading LLC, a Delaware limited liability company, as agent ("**Macquarie**"), and (g) Macquarie Investments US Inc., as Lender, entered into that certain Class D Replacement Funding Agreement (the "**Class D Agreement**"), secured by rights related to certain Designated Pictures (as defined in the Class D Agreement). Obligations under the Class D Agreement matured on April 12, 2017. Interest accrued on such obligations at 12% per annum, paid monthly in kind, in arrears until the maturity date, when it was due in cash. Prior to the Petition Date, Macquarie foreclosed on the Designated Pictures pursuant to an approximately $9,000,000.00 credit bid. As of the Petition Date, approximately $4,949,000.00 remained outstanding under the Class D Agreement, secured by certain distribution rights with respect to the Designated Pictures. As a result of Macquarie's foreclosure, the approximately $4,949,000.00 outstanding under the Class D Agreement constitutes a General Unsecured Claim and will be treated as such.

c.    *Aperture Agreement*

On May 3, 2017, Armored Car Productions, LLC, a California limited liability company ("**Armored Car**"), as borrower, and Aperture Media Participations, LLC, a Delaware limited liability company ("**Aperture**"), as lender, entered into that certain Loan and Security Agreement (the "**Aperture Agreement**") pursuant to which Aperture provided a multiple draw, non-revolving loan to Armored in the amount of $4,941,592.57 (the "**Aperture Obligations**"). The Aperture Obligations are secured generally by the revenue stream related to the *Masterminds*, which remains in place after the Sale described herein. Interest accrues on the Aperture Obligations, with respect to base rate loans, at the base rate plus 11% and with respect to LIBOR rate loans, LIBOR plus 12.5%. The Aperture Obligations are due in full on the Maturity Date (as defined in the Aperture Agreement) and paid down currently from the title's revenue stream. Since the Sale (defined and described further herein), the *Masterminds* revenue stream flows to the Purchaser rather than the Debtors, though the payment from the title's revenue stream remains in place. As of the Petition Date, approximately $974,000 of Aperture Obligations remained outstanding.

d.    *Replacement P&A Notes*

Four (4) notes were issued pursuant to the 2016 Plan, in each case in favor of RKA Film Financing, LLC ("**RKA**"). Each such note was issued pursuant to the 2016 Plan in satisfaction of claims outstanding as of commencement of the 2015 Bankruptcy and with respect to each note, was secured by certain collateral related to a specific film. RKA foreclosed on the collateral securing two (2) of these notes prior to the Petition Date, though a deficiency amount remains outstanding. The remaining amounts owed under the notes are described below.

---

[11] The Lazarus Borrower is a non-Debtor.

| Obligor | Film Name | Terms | Amount outstanding (in thousands) as of May 3, 2018 |
|---------|-----------|-------|------------------------------------------------------|
| Armored Car Productions, LLC | *Masterminds* | Treasury rate plus 1.5% interest per annum; matures on February 1, 2019. Secured by revenue stream of the title according to a predetermined waterfall | $34,717 |
| DR Productions, LLC | *The Disappointments Room* | | $22,812 |
| RML Kidnap Films, LLC | *Kidnap* | | $16,409 |
| RML Somnia Films, LLC | *Somnia (Before I Wake)* | | $25,503 |

No party guarantees, or is otherwise obligated to pay, amounts due under each note; each loan is non-recourse to RML and its affiliates, other than the special purpose entities developing the applicable film. However, each such note is secured by various intellectual property and distribution rights with respect to the applicable films listed above. In each case, to provide RKA with the benefit of such security interests, each of RML Somnia Films, LLC, Armored Car, RML Kidnap Films, LLC, the Lazarus Borrower, DR Productions, LLC, RDD and RMLDD executed that certain Security Agreement dated as of April 12, 2016 in favor of RKA.[12] Since the Sale (defined and described further herein), the revenue streams pertaining to the above titles flow to the Purchaser rather than the Debtors, though the payment from the respective title's revenue stream remains in place.

e.   *Intercreditor & Subordination Agreements*

The relationships among the Debtors' lenders are governed by the following intercreditor agreements (each, an "**Intercreditor Agreement**") and Subordination Agreement (as defined below, and together with each Intercreditor Agreement, the "**Intercreditor Agreements**"):[13]

a.   that certain Subordination and Intercreditor Agreement dated as of April 12, 2016 between Macquarie as agent for the Senior Creditors (as defined therein) and UltraV as agent for the Second Lien Creditors (as defined therein) (the "**Macquarie Intercreditor Agreement**");

b.   that certain Fourth Amended and Restated Intercreditor Agreement dated as of May 3, 2017 by and among OneWest Bank ("**OneWest**"),[14] as agent for itself and the Production Lenders (as defined therein), Comerica Bank as the Senior P&A Lender (as

---

[12] RML Somnia Films, LLC, RML Kidnap Films, LLC and Lazarus Borrower are non-Debtors.

[13] The Debtors' lenders, including the Prepetition Secured Note Lender, are governed by the Intercreditor Agreements described in subparagraphs (a)-(k) below. In addition, the Debtors' lenders, **not including the Prepetition Secured Note Lender**, are governed by the Intercreditor Agreements described in subparagraphs (l)-(n) below.

[14] This entity was formerly known as CIT Bank, NA and, upon information and belief, is now known as OneWest Bank, a division of CIT Bank, N.A.

defined therein), North American Panda, LLC as the Subordinate P&A Party (as defined therein), Aperture as the Aperture Lender (as defined therein), RKA as the RKA Lender (as defined therein), UniFi Completion Guaranty Insurance Solutions, Inc. ("**UniFi**") as Completion Guarantor (as defined therein), the Payee (as defined therein) and Relativity Secured Lender, LLC (the "**Subordinated Lender**") (the "**Masterminds Production Intercreditor Agreement**");

c.      that certain Second Amended and Restated Intercreditor Agreement dated as of April 12, 2016 among RKA as the RKA Lender (as defined therein), UniFi as agent and attorney-in-fact as described therein, OneWest, as agent for itself and the Production Lenders (as defined therein), UltraV and the Subordinated Lender (the "**DR Intercreditor Agreement**");

d.      that certain Intercreditor Agreement dated as of April 12, 2016 among RKA as the RKA Lender (as defined therein), UltraV and the Subordinated Lender (the "**Somnia P&A Intercreditor Agreement**");

e.      that certain Intercreditor Agreement dated as of April 12, 2016 among RKA as the RKA Lender (as defined therein), UltraV and the Subordinated Lender (the "**Kidnap P&A Intercreditor Agreement**");

f.      that certain Intercreditor Agreement dated as of April 12, 2016 among RKA as the RKA Lender (as defined therein), UltraV and the Subordinated Lender (the "**Lazarus P&A Intercreditor Agreement**");

g.      that certain Subordination and Intercreditor Agreement dated as of April 12, 2016 between MidCap Financial Trust and UltraV (the "**MidCap Intercreditor Agreement**");

h.      that certain Intercreditor Agreement dated as of April 12, 2016 among Manchester Library Company LLC, MidCap Financial Trust, RKA, Macquarie, CIT Bank, NA, UltraV, the Subordinated Lender and the other parties thereto (the "**Manchester Library Intercreditor Agreement**");

i.      that certain Intercreditor Agreement dated as of April 12, 2016 by and among MidCap Financial Trust, Macquarie, RKA, OneWest, UltraV, the Subordinated Lender, RML, RMLDD, RDD and RDI (the "**Omnibus Accounts Intercreditor Agreement**");

j.      that certain Subordination Agreement dated as of April 12, 2016 between the Subordinated Lender and UltraV (the "**Subordination Agreement**");

k.      that certain Theatrical Accounts Intercreditor Agreement dated as of April 12, 2016 by and among CIT Bank, N.A., Macquarie, RKA, the Subordinated Lender, Midcap Financial Trust and acknowledged and consented to by RML, RMLDD, RDD and RDI (the "**Theatrical Accounts Intercreditor Agreement**");

l.      that certain Subordination and Intercreditor Agreement dated as of April 12, 2016 among Macquarie and the Subordinated Lender (the "**Class D Subordination Agreement**");

m.      that certain Subordination and Intercreditor Agreement dated as of April 12, 2016 between Midcap Financial Trust and the Subordinated Lender (the "**Second Lien Subordination Agreement**"); and

n.      that certain Intercreditor Agreement dated as of April 12, 2016 between Macquarie as agent for the Post-Release Lenders (as defined therein) and RKA (the "**Lazarus Effect Intercreditor Agreement**").

## F.      Events Leading to Chapter 11 Cases

Pursuant to the 2016 Plan, reorganized Relativity was required to, among other things, "undertake such Restructuring Transactions as may be necessary or appropriate to effect, in accordance with applicable non-bankruptcy law, a restructuring of the Debtors' or Reorganized Debtors' respective business or simplify the overall organizational structure of the Reorganized Debtors, including but not limited to resolving intercompany claims, all to the extent not inconsistent with any other terms of this Plan." *See* 2016 Plan at III.E.1.  In addition, the 2016 Plan provided that the proceeds of any equity raised would be used as a source for funding the 2016 Plan. *See Second Amended Disclosure Statement for Plan Proponents' Second Amended Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Case No. 15-11989 at Docket No. 1174] (the "**2016 Disclosure Statement**") at IV.C ("Jim Cantelupe, of Summit Trail Advisors, LLC, has committed to work with the Debtors to raise up to $100.0 million of new equity to fund the Plan."); *see also* 2016 Plan at III.F ("The Debtors or Reorganized Debtors, as applicable, are authorized to execute and deliver any documents necessary or appropriate to obtain Cash for funding this Plan. All consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained through a combination of one or more of the following: (a) Cash on hand of the Debtors, including Cash from business operations, or distributions from Non-Debtor Affiliates; (b) proceeds of the sale of assets; (c) the Exit Funding; (d) the proceeds of any tax refunds and the RKA Causes of Action; (e) the proceeds of any equity raise; and (f) any other means of financing or funding that the Debtors or the Reorganized Debtors determine is necessary or appropriate.").

In addition, pursuant to the 2016 Plan, Joseph Nicholas ("**Nicholas**") and Ryan Kavanaugh ("**Kavanaugh**") became the officers and directors of Relativity Holdco and were authorized to select the directors for the boards of managers/directors of the direct and indirect subsidiaries of Relativity Holdco. *See* 2016 Plan at III.G.2. Nicholas resigned as co-chairman and co-CEO of RML on September 13, 2016 and, effective as of December 31, 2016, forfeited his equity interest in Relativity Holdco.

      1.    *Relativity's Efforts to Raise Debt and Equity*

Upon the 2015 Debtors' emergence from bankruptcy, Relativity's business lines generally remained intact, with the exception of Relativity's unscripted television division, which was purchased by certain of Relativity's senior secured lenders as part of the 2015 Debtors' chapter 11 cases. Relativity's capital structure had been deleveraged by approximately $600 million and, as a result of the sale of the television division and other cost-cutting measures implemented by Relativity as part of the restructuring, Relativity's overhead was reduced by approximately 66%. Relativity intended to raise $50-$100 million of new common equity for general working capital purposes, various strategic growth initiatives across Relativity. In addition, Relativity sought new debt financing in the approximate amount of $150 million.

To reach these goals, Relativity had a full-time employee dedicated to capital-raising efforts. In addition, Kavanaugh and Nicholas dedicated their efforts to support the capital raising. These three (3) individuals worked with Houlihan Lokey Capital Inc. ("**Houlihan**"), which was engaged by the Company on April 6, 2016 as its exclusive placement agent in connection with the possible private placement of more than $100 million in equity or equity-linked securities involving the Company. Houlihan was authorized to act on a "best efforts" basis as the agent of the Company in the offering and placement of Relativity Holdco's securities. Pursuant to the engagement letter with Houlihan, if the Company, prior to June 30, 2016, received more than one (1) bona fide term sheet for at least $50 million, the duration of the Houlihan engagement letter would automatically extend until December 31, 2016 and thereafter month to-month. The Houlihan engagement letter was subsequently amended to provide that the term would expire on June 30, 2016 with month-to-month extensions thereafter unless terminated with 30 days' notice.

During May 2016, the Company engaged EMP Media Partners LLC ("**EMP**") and Aperture as co-arrangers of debt recapitalization in connection with a possible $100 million P&A/Ultimates revolver and an $85 million film library term loan. From April to June 2016, the Company and Houlihan prepared and finalized a management presentation (the "**Equity Presentation**") related to the offering of common equity and other securities of Relativity Holdco. Additionally, the Company and EMP prepared a similar management presentation (the "**Recapitalization Presentation**") that was provided to substantially all, if not all, of the potential financiers with whom the Company and/or EMP engaged. Houlihan's efforts were not successful, and Houlihan provided notice of its resignation on January 12, 2017, with the resignation becoming effective February 11, 2017.

In October 2016, the Company signed a Broker Dealer Services Agreement with Growth Capital Services and EMP for the private placement of the Company's debt or equity securities (the "**Offering**"). The services agreement was for a one-year term and provided that services during the term could include: (a) reviewing the client's financial condition, operations,

competitive environment, prospects and related matters; (b) preparing an information package or confidential information memorandum; (c) identifying potential investors and interested parties; (d) preparing and implementing a plan to engage in discussions with potential investors and interested parties; (e) coordinating and evaluating indications of interest and proposals regarding the Offering; and (f) providing such other financial advisory and investment banking services reasonably necessary to accomplish the foregoing.  That same month, the Company started to work with Storyoscopic as an arranger to help facilitate introductions and potential investments.  These efforts were all ultimately unsuccessful.

From the 2016 Plan Effective Date through at least the fall of 2017, the Company and/or its various advisors engaged with a wide range of parties regarding a multitude of possible transactions, including: (a) for the equity raise, at least 32 high net worth individuals, companies and/or funds (of which at least five (5) engaged in extensive discussions and/or diligence), (b) for the debt recapitalization, at least 14 companies and/or funds, (c) for a sale of the film library, at least seven (7) companies and/or funds and (d) for an investment in the film production slate, at least three (3) companies.[15]   Despite these efforts, only one (1) potential transaction led to an investment in the Company.  YuuZoo Corporation Limited ("**YuuZoo**") and the Company signed a binding letter of intent on October 27, 2016 for an equity investment and content license agreement (the "**YuuZoo LOI**").   On November 25, 2016, YuuZoo issued a press release concerning the deal terms set forth in the YuuZoo LOI, which included YuuZoo making a (x) $15 million equity investment in the Company on November 23, 2016 and (y) $35 million equity investment in the Company between January and June 2017.  The deal also included an additional possible investment of up to $100 million.

On or around November 23, 2016, YuuZoo paid $2.5 million towards its initial investment.[16]   However, shortly thereafter, YuuZoo breached the YuuZoo LOI.  In December 2016, in an attempt to salvage the transaction, the parties pivoted to a content acquisition and distribution agreement format with an equity investment thereafter.  This arrangement, however, was never consummated.  Despite the breach, the parties yet again resumed discussions concerning the deal between February and March 2017, but no deal emerged and no further payments to the Company were made by YuuZoo.  Thus, despite the Company's efforts, including, but not limited to, engagement of various professionals, dedication of an employee to equity/debt recapitalization efforts, direct involvement of the co-managers in the equity raise, discussions and negotiations with many parties including managing an extensive diligence process with several interested investors, the Company was unable to secure the debt or equity capital necessary to execute on its business plan.

Accordingly, in early 2018, discussions turned to negotiating a path toward maximizing the value of the remaining business.  Given the inability to raise new capital in the market, it became apparent that the only viable path was an arrangement with the Company's incumbent senior secured lender, UltraV (UltraV purchased the Prepetition Secured Note on or about

---

[15] These statistics are based on the Company's books and records and the knowledge of employees currently with the Company.  However, Kavanaugh and Nicholas had meetings and discussions with investors not included herein.

[16] This amount was used to pay down the RM Bidder Note (as defined in the 2016 Plan).

February 28, 2018).  As such, on February 26, 2018, Kavanaugh signed a restructuring support agreement with UltraV, providing the framework for the sale of the Debtors' assets to UltraV.

2. *Relativity From the 2016 Plan Effective Date to the Present Chapter 11 Cases*

Since the 2015 Debtors emerged from bankruptcy, the Companyy (i) paid off in full its DIP and Ultimates loans as set forth in the 2016 Plan, (ii) released *Masterminds* and *TDR* in September 2016 in accordance with the 2016 Plan after litigating with Netflix over the release of the films, (iii) entered into a P&A loan with Comerica Bank and North American Panda, LLC for up to $11 million in connection with *Masterminds* (this loan did not close until September 2016 because of the litigation discussed above with Netflix), which was paid in full, (iv) paid off in full amounts owed to CIT (the production lender as set forth in the 2016 Plan), which included $11.4 million for *TDR* and $19.7 million for *Masterminds*, (v) paid off in full $680,000 owed to Unifi as the bond insurer with respect to *Masterminds* and *TDR*, (vi) paid down the Midcap Library Facility by approximately $32.5 million and extended the loan's maturity date (originally only a one-year term) through July 2018, (vii) paid down approximately $13.8 million owed to Macquarie (the post-release lender as set forth in the 2016 Plan) and subsequently effectuated an orderly transition of three (3) titles to Macquarie (*Lazarus*, *Woman in Black 2*, and *Beyond the Lights*), which resulted in a decrease of its outstanding loan by an additional $9 million, leaving a balance of approximately $4.8 million, (viii) obtained a mezzanine loan secured by *Masterminds* for $4.94 million, which allowed the Company to preserve its ongoing business, which now has a balance of just under $1 million, (ix) continued paying residuals and participations payments over the last two (2) years with respect to the Company's entire library, (x) continued uninterrupted servicing and distribution of nearly 70 library titles, which are owned by the Company for the benefit of Midcap, Macquarie or Vine (formerly Manchester), (xi) preserved its core group of development titles for future production, (xii) entered into license deals with third parties to fill slots required by the Company's contract with Netflix (filling three (3) slots with films released in 2017), (xiii) settled or resolved various arbitrations and/or litigation and (xiv) executed debt to equity conversions with Carat and YFE.

The Company also (i) sold various assets and/or distribution rights (e.g., *The Crow*, *Animal Crackers*, *Fearless*, part of its music library and interests in Relativity Education) to pay down RM Bidder, which also received $2.5 million from YuuZoo before YuuZoo backed out of the YuuZoo LOI, (ii) assisted the litigation trust formed under the 2016 Plan in handling claims objections in accordance with the 2016 Plan, (iii) transferred two (2) titles (*Somnia* and *Kidnap*) to RKA for a decrease of its debt by $2.5 million, (iv) transferred three (3) titles (*3:10 to Yuma*, *The Forbidden Kingdom* and *The Bank Job*) to Vine/Verite in accordance with the 2016 Plan, (v) terminated other distribution deals (e.g., *The First Monday in May* (fka *Met Ball*), *Hunter Killer*, *Solace*, *Collide and Den of Thieves*) and (vi) slimmed down operations and overhead to maintain operations and accomplish many of the items listed above.  In addition, the Company (a) paid the Guilds approximately $6.6 million on account of the Guilds' secured claim under the 2016 Plan and (b) deposited approximately $2.3 million over time in the secured Guild's trust account for secured residuals based on receipts for all titles collected since the 2015 Debtors' emergence from bankruptcy.

III.    **THE CHAPTER 11 CASES**

A.    <u>**Voluntary Petitions**</u>

On the Petition Date, the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Pursuant to the Bankruptcy Court's order on May 7, 2018, the Chapter 11 Cases have been consolidated for procedural purposes only and are being administered jointly.  *See* Docket No. 5.  The Debtors have continued, and will continue until the Effective Date, to manage their properties as debtors-in-possession, subject to the supervision of the Bankruptcy Court and in accordance with the provisions of the Bankruptcy Code.  An immediate effect of the filing of the Chapter 11 Cases was the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, which, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, enforcement of liens against any assets of the Debtors and litigation against the Debtors.

B.    <u>**First and Second Day Motions**</u>

On the Petition Date and shortly thereafter, the Debtors filed a number of motions and other pleadings (the "**First Day Motions**").  The First Day Motions were proposed to ensure the Debtors' orderly transition into the chapter 11 proceedings.  The Bankruptcy Court entered the following orders concerning the First Day Motions (with certain adjustments or modifications to accommodate the concerns of the Bankruptcy Court, the U.S. Trustee and other parties in interest):

- orders authorizing (a) joint administration of the Chapter 11 Cases, (b) the use of Prime Clerk as the Debtors' Claims Agent and (c) case management procedures [Docket Nos. 5, 41 and 221];

- orders authorizing the Debtors to continue prepetition insurance coverage and pay related prepetition obligations [Docket Nos. 69 and 220];

- orders approving the Debtors' payment of certain employee wages and benefits [Docket Nos. 43 and 218];

- orders approving the Debtors' ability to make certain prepetition residuals and participations payments incurred in the ordinary course of business [Docket Nos. 45 and 219];

- orders approving the continued use of the Debtors' existing cash management system [Docket Nos. 42 and 224];

- interim orders approving the Debtors' ability to obtain postpetition financing and use cash collateral [Docket Nos. 56, 217, 246, 287, 360 and 444]; and

- a final order approving the Debtors' ability to obtain postpetition financing and use cash collateral [Docket No. 479] (including all amendments and modifications, the "**Final DIP Order**").  Pursuant to the Final DIP Order, the Bankruptcy Court authorized the Debtors to obtain up to $4,000,000.00 in postpetition debtor-in-possession financing (the "**DIP Facility**").

C.    **Retention of the Debtors' Professionals**

After the commencement of the Chapter 11 Cases, the Debtors obtained Bankruptcy Court approval to retain (a) Winston & Strawn LLP as counsel [Docket No. 313], (b) Willkie Farr & Gallagher LLP as Special Litigation Counsel [Docket No. 340], (c) M-III Partners to provide interim management services [Docket No. 306]; and (d) Colin M. Adams as Chief Restructuring Officer [Docket No. 306]. The applications to retain these professionals were granted with certain adjustments or modifications to accommodate the concerns of the Bankruptcy Court, the U.S. Trustee, the Creditors' Committee and other parties in interest. In connection with these applications, the Debtors sought and obtained approval to establish procedures for interim monthly compensation of professionals. *See* Docket No. 288.

D.    **The Creditors' Committee**

On May 18, 2018, the U.S. Trustee appointed the Creditors' Committee pursuant to section 1102 of the Bankruptcy Code. *See* Docket No. 139. The Creditors' Committee initially consisted of the following five (5) members: (1) Cinedigm Corp.; (2) Crystal Screens Media, Inc.; (3) WWE Studios, Inc.; (4) Pure Flix Entertainment, LLC; and (5) Adam Fields. The Creditors' Committee obtained Bankruptcy Court approval to retain Robins Kaplan LLP as counsel [Docket No. 412] and Duff & Phelps Securities, LLC as financial advisor [Docket No. 411].

Since its appointment, the Creditors' Committee has been actively involved with the Debtors in overseeing the administration of the Chapter 11 Cases as a fiduciary for all of the Debtors' unsecured creditors. The Debtors have discussed their business operations with the Creditors' Committee and their advisors and have negotiated with the Creditors' Committee regarding actions and transactions outside of the ordinary course of business. The Creditors' Committee has participated actively in reviewing the Debtors' business operations, operating performance and business plan. For example, the Creditors' Committee extensively investigated the Debtors, UltraV and the relief sought by the *Debtors' Motion for Entry of Interim and Final Orders: (I) Authorizing the Debtors to (A) Obtain Post-Petition Financing and (B) Use Cash Collateral; (II) Granting Adequate Protection; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* [Docket No. 17] (the "**DIP Motion**") and the Sale Motion. In connection with that investigation, the Debtors and UltraV provided the Creditors' Committee with documents that it requested. While the Creditors' Committee filed a reservation of rights and formal objection to the DIP Motion and a reservation of rights in connection with the Sale Motion, the Creditors' Committee also pursued resolution of its concerns on an informal basis through negotiations with the Debtors and UltraV. These efforts led to a number of discussions and negotiations, including an all-hands meeting and negotiation among representatives of the Debtors, the Creditors' Committee and UltraV on June 12, 2018. That meeting and the significant follow-up diligence and good faith, arm's-length negotiations among the Debtors, the Creditors' Committee and UltraV over the following weeks ultimately provided the foundation for the Global Settlement Agreement.

19

E.    **Other Motions in the Chapter 11 Cases**

Since the Petition Date, the Debtors have sought and obtained approval for a number of additional motions to aid in the efficient administration of the Chapter 11 Cases. The most significant additional motions are described below.

1.    *Motion to Reject Certain Executory Contracts*

On May 8, 2018, the Debtors filed *Debtors' Motion for an Order Authorizing the Rejection of Certain Executory Contracts Nunc Pro Tunc to the Petition Date* [Docket No. 13]. The Debtors sought to reject certain employment contracts after determining that the contracts did not provide any ongoing value to the Estates. On May 10, 2018, the Bankruptcy Court entered an order authorizing the Debtors to reject the employment contracts. *See* Docket No. 46.

2.    *The Sale Order*

On May 17, 2018, the Debtors filed *Debtors' Motion for Entry of an Order (I) Authorizing and Approving (A) the Debtors' Entry Into the Asset Purchase Agreement for the Sale of Substantially all Their Assets, (B) the Sale of Substantially all the Debtors' Assets Free and Clear of Liens, Claims and Encumbrances (Other Than Assumed Liabilities) Pursuant to Section 363 of the Bankruptcy Code and (C) the Assumption and Assignment of Executory Contracts and Unexpired Leases Pursuant to Section 365 of the Bankruptcy Code, and (II) Granting Related Relief* [Docket No. 77] (the "**Sale Motion**"). The Asset Purchase Agreement contemplated a sale of substantially all of the Debtors' assets and an assumption and assignment of executory contracts associated with such assets for a credit bid of $40 million and certain other consideration. Accordingly, on July 10, 2018, in furtherance of the Sale Motion, the Debtors served the *Notice of (I) Proposed Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Sale and (II) Associated Cure Costs* [Docket No. 319] (the "**Notice of Assignment and Cure**") on all of the parties entitled to notice.

On July 5, 2018, the Court entered a scheduling order in connection with the Sale Motion [Docket No. 304], which was amended by the *Order Amending Pertinent Dates and Deadlines Set Forth in the (A) Sale Scheduling Order and (B) Related Bid Procedures* [Docket No. 356] (the "**Amended Sale Scheduling Order**"). Pursuant to the Amended Sale Scheduling Order, if Bids (as defined in the Sale Motion) were received by the Bid Deadline (as defined in the Amended Sale Scheduling Order), an auction would be held on July 31, 2018 at 10:00 a.m. (Eastern Time). The only Bid that the Debtors received was the bid from the Purchaser in connection with the Asset Purchase Agreement. As such, the Debtors did not conduct an auction. On August 21, 2018, the Bankruptcy Court entered an order granting the Sale Motion. *See* Docket No. 502 (the "**Sale Order**"). The sale (the "**Sale**") between the Debtors and the Purchaser closed on October 10, 2018.

Pursuant to the Asset Purchase Agreement and the Sale Order, for a period beginning on the day the Sale closed (*i.e.*, October 10, 2018) to sixty (60) days thereafter (*i.e.*, on or before December 9, 2018) (the "**Designation Rights Period**"), the Debtors are authorized to assume any Executory Contract or Unexpired Lease that has not been previously rejected (each such Executory

Contract or Unexpired Lease, a "**Designation Rights Contract**") and assign such Designation Rights Contract to UltraV in accordance with the terms of the Asset Purchase Agreement.

As to each Designation Rights Contract, as soon as practical after receiving written notice from UltraV during the Designation Rights Period requesting assumption and assignment of any Designation Rights Contract (each, an "**Assumption Notice**"), the Debtors shall, subject to UltraV demonstrating adequate assurance of future performance thereunder to the extent required and an objection by the applicable counterparty to such contract with respect to adequate assurance has not otherwise been withdrawn, waived or overruled (as applicable), including by the terms of the Sale Order, take all actions required by the Sale Order or otherwise that are reasonably necessary to seek to assume and assign to UltraV or its designated Affiliates(s) such Designation Rights Contract pursuant to section 365 of the Bankruptcy Code.  Any Designation Rights Contract assumed in accordance with the Asset Purchase Agreement shall constitute an Assumed Contract under the Asset Purchase Agreement.

As soon as practical after receiving further written notice from UltraV during the Designation Rights Period requesting rejection of any Designation Rights Contract or declaring any such Designation Rights Contract to be an Excluded Asset (each, a "**Rejection Notice**"), or if, at the end of the Designation Rights Period, no Assumption Notice or Rejection Notice is delivered with respect to a Designation Rights Contract, then such Designation Rights Contract shall be deemed to be an Excluded Asset (and not an Assumed Contract or a Purchased Contract or a Purchased Asset) for all purposes of the Asset Purchase Agreement.

The analysis of such Designation Rights Contracts is ongoing, and will be completed on or before the expiration of the Designation Rights Period.

**Any Executory Contract or Unexpired Lease that does not become an Assumed Contract (as defined in the Asset Purchase Agreement) shall be automatically deemed rejected by the Debtors on the Effective Date.**

3.    *Claims Process and Bar Date*

On July 27, 2018, the Bankruptcy Court entered an order establishing (a) September 12, 2018 at 5:00 p.m. (Eastern Time) as the deadline for each Person or Entity to File a Proof of Claim in respect of a prepetition claim (as defined in section 101(5) of the Bankruptcy Code) against any of the Debtors (the "**General Bar Date**") and (b) October 30, 2018 at 5:00 p.m. (Eastern Time) as the deadline for governmental units (as defined in section 101(27) of the Bankruptcy Code) to File a Proof of Claim in respect of a prepetition claim against any of the Debtors (the "**Governmental Bar Date**").  As of the General Bar Date, approximately 1,900 Proofs of Claim have been filed in the Chapter 11 Cases.

4.    *WWE Studios 9019*

On October 29, 2013, RML and WWE Studios, Inc. ("**WWE**") entered into an agreement (the "**WWE Prepetition Agreement**") in connection with the production of a supernatural horror film, *Oculus*.  Pursuant to the WWE Prepetition Agreement, RML agreed to remit to WWE an agreed-upon percentage of net proceeds generated by *Oculus* which generally provided for a waterfall that provided for (a) RML to recoup its distribution costs, (b) WWE to recoup its initial

contribution pro rata and pari passu with RML's recoupment of certain costs and participations and (c) a split of remaining gross receipts in accordance with the WWE Prepetition Agreement (collectively, the "**Oculus Waterfall**").

On June 22, 2018, the Debtors filed the *Motion for Entry of an Order Authorizing RML Oculus Films, LLC to: (A) Enter Into Settlement Agreement with WWE Studios, Inc.; and (B) Enter into Amendment and Assume Associated Agreement* [Docket No. 269] (the "**WWE Settlement Motion**"). Pursuant to the WWE Settlement Motion, the Debtors and WWE entered in a settlement agreement (the "**WWE Settlement Agreement**") whereby (a) WWE agreed to (i) dismiss its objection to the Debtors' objection to the proof of claim Filed by WWE in the 2015 Bankruptcy, (ii) dismiss the arbitration that it initiated pursuant to the WWE Prepetition Agreement and (iii) forego the arbitration award that WWE was awarded on March 7, 2018 in connection with the WWE Prepetition Agreement and (b) RML and WWE agreed to waive all claims against each other arising before the effective date of the WWE Settlement Agreement (other than as specifically provided for in the WWE Settlement Agreement) and to release all claims against the MidCap Entities (as defined in the WWE Settlement Agreement) related to the WWE Prepetition Agreement. On July 26, 2018, the Bankruptcy Court entered an order granting the WWE Settlement Motion pursuant to which WWE has no Allowed Claim against the Estates. *See* Docket No. 383.

5.    *Global Settlement Agreement*

On August 10, 2018, the Bankruptcy Court entered an order [Docket No. 478] (the "**Global Settlement Order**") approving the *Debtors' Motion for Entry of an Order Authorizing the Debtors and Certain Non-Debtor Affiliates to Enter Into Settlement Agreement With the Official Committee of Unsecured Creditors and UltraV Holdings LLC* [Docket No. 348] (the "**Global Settlement Motion**") over certain objections, including an objection by the U.S. Trustee. Pursuant to the Global Settlement Order, the Debtors, UltraV and the Creditors' Committee entered into a settlement agreement (the "**Global Settlement Agreement**") allowing the Debtors to obtain the financing necessary to prepare, prosecute and obtain confirmation of a liquidating plan that should pay all Allowed Administrative Expenses and Priority Claims and provide Distributions to Holders of General Unsecured Claims through the Liquidating Trust. In accordance with the Global Settlement Agreement:

a.    the DIP Claims and the Prepetition Secured Note Claims were deemed Allowed Claims, but the DIP Lender and Prepetition Secured Note Lender agreed to waive their right to receive any Distribution on account of any deficiency Claim relating to the DIP Note and the Prepetition Secured Note from any of the Debtors' assets that do not constitute Purchased Assets. Pursuant to the Plan, the waived right to receive proceeds shall be treated as if that portion of the Claims was deemed avoided for the benefit of the Debtors' Estates;

b.    the Creditors' Committee consented to the entry of a final order concerning the DIP Facility;

c.     UltraV provided the Debtors cash in an amount sufficient to pay (i) all accrued and unpaid expenses of the Debtors as of the sale's Closing Date (as defined in the Asset Purchase Agreement) to the extent provided for in the Approved Budget, subject to Permitted Variance (both as defined in the Global Settlement Agreement), *plus* (ii) an amount sufficient to pay projected priority Claims and the reasonably projected Administrative Expenses to be incurred by the Debtors through Confirmation not included in clause (i), *plus* (iii) $400,000 that was deposited into a segregated account and will be transferred to the Liquidating Trust upon Confirmation. In addition, UltraV agreed to transfer to the Debtors (x) the first $1,000,000 of Net Licensing Revenues and (y) 5% of all Net Licensing Revenues in excess of $2,000,000 provided that in no event shall the Debtors or the Liquidating Trust be entitled to receive in excess of $2,000,000 in the aggregate from Net Licensing Revenues. Should the Net Licensing Revenues paid pursuant to clause (y) not equal or exceed $250,000 prior to December 31, 2020, UltraV (or its successors or assigns) will pay to the Liquidating Trust an amount equal to the difference between the amount actually paid pursuant to clause (y) above prior to December 31, 2020 and $250,000;

d.     the Debtors retained all causes of action (i) against (aa) current or former employees, directors, officers, agents, representatives, managers and members of Relativity (other than Lori Sinanyan, where causes of action against Ms. Sinanyan, if any, were purchased by UltraV), (bb) YooZoo, (cc) Adam Fields and (dd) Relativity's current or former professionals (including, without limitation, all accountants, attorneys, consultants and financial advisors); or (ii) related to the Retained Assets; and

e.     the carve-out in the DIP Facility for the Creditors' Committee's Professionals was increased from $300,000 to $700,000.

The Global Settlement Order provides that the consideration paid by UltraV pursuant to the Global Settlement Agreement is in exchange for the agreements, waivers and other consideration pursuant to the Global Settlement Agreement and shall only be distributed in accordance with a confirmed plan. Accordingly, the Debtors hold this consideration free and clear of liens, and the Plan provides for the funding of the Liquidating Trust with the Global Settlement Agreement proceeds for use in accordance with the Liquidating Trust Agreement, including distribution of such funds to Class 4 General Unsecured Creditors.

6.     *.Netflix Contracts*

On October 5, 2017, the Superior Court for Santa Clara County, California awarded Netflix $93,177.43 plus interest for attorneys' fees and costs incurred in connection with the proceeding *RML Distribution Domestic, LLC v. Netflix, Inc.*, Case No. 16-CV-301166 (the "**California Judgment**"). On May 30, 2018, the Debtors filed *Debtors' Motion Pursuant to 11 U.S.C. §§ 105*

*and 365 and Fed. R. Bankr. P. 6006 for Entry of an Order Approving Assumption of Executory Contracts with Netflix, Inc.* [Docket No. 213] (the "**Netflix Assumption Motion**") and sought authorization to assume and assign the following contracts with Netflix (collectively, the "**Netflix Agreements**") to the Purchaser in connection with the Asset Purchase Agreement: (a) that certain License Agreement for Internet Transmission, dated as of June 1, 2010 (as amended, the "**Domestic License Agreement**"); (b) that certain License Agreement for Internet Transmission, dated or effective as of June 24, 2011 (the "**Latin America License Agreement**"); (c) the Amended and Restated Collection Account Management Agreement, dated or effective as of October 1, 2012 and (d) the Confidential Waiver, Release, and Settlement Agreement, dated or effective as of May 30, 2012.

On June 1, 2018, Netflix filed an adversary proceeding against the Debtors in the Bankruptcy Court styled *Netflix, Inc. v. Relativity Media, LLC and RML Distribution Domestic,* LLC, No. 18-01552 (the "Netflix Adversary Proceeding"). In the complaint, Netflix sought, among other things, a determination that (a) the Debtors breached certain provisions of the Domestic License Agreement, (b) Netflix was entitled to damages arising from the Debtors' breaches and (c) Netflix's temporary hold on the payment of license fees periodically coming due and owing under the Domestic License Agreement and the Latin American License Agreement was and is proper. On June 5, 2018, Netflix filed an objection to the DIP Motion. *See* Docket No. 232. On July 9, 2018, Netflix filed a motion seeking relief from the automatic stay to exercise certain setoff rights in connection with the Netflix Agreements. *See* Docket No. 317. On July 11, 2018, Netflix objected to the Netflix Assumption Motion [Docket No. 326] (the "**Netflix Assumption Objection**"). On July 27, 2018, Netflix objected to the Sale Motion [Docket No. 393], and on July 30, 2018, Netflix objected to the Notice of Assignment and Cure [Docket No. 407]. On July 30, 2018. Netflix objected to the Global Settlement Motion. *See* Docket No. 405.

On August 1, 2018, the Bankruptcy Court made certain oral rulings with regard to Netflix's entitlement to damages in the Netflix Adversary Proceeding, and following those rulings, the Debtors and Netflix met and conferred concerning a global resolution of all issues in dispute. On August 2, 2018, Netflix paid $3,928,830 to the Debtors, which had previously been withheld by Netflix under the Domestic License Agreement and the Latin America License Agreement (the "**Withheld Amounts**"). On August 14, 2018, the Bankruptcy Court entered an order approving a settlement between the parties. Among other things, pursuant to the Netflix Settlement:

    a.    On account of Netflix's payment of the Withheld Amounts, Netflix shall retain all of its rights and obligations with respect to the Titles (as defined in the Domestic License Agreement) to which the Withheld Amounts relate in accordance with the terms set forth in the Domestic License Agreement or the Latin America License Agreement;

    b.    As to the CSMI Titles (as defined in the Netflix Settlement), Crystal Screens Media, Inc. ("**CSMI**") agreed (a) to stand by the assurances in its June 13, 2018 letter with respect to the CSMI Titles (as defined in the Netflix Settlement); (b) to a start date for the second Availability Period (as defined in the Domestic License Agreement) for *Beyond the Lights* of December 24, 2022, to be designated by

UltraV; (c) to a start date for the second Availability Period (as defined in the Domestic License Agreement) for *The Lazarus Effect* of November 1, 2017, as was designated by the Debtors; (d) to a start date for the second Availability Period (as defined in the Domestic License Agreement) for *The Woman in Black 2: Angel of Death* of November 1, 2018, to be designated by UltraV; and (e) to release certain claims CSMI may have against Relativity, Netflix and UltraV relating to the CSMI Titles through the date of the Debtors' agreement with CSMI.

c.  As to *And So It Goes*, the parties agreed that Netflix has no ongoing rights. As to *Hector and the Search for Happiness*, the parties agreed that no second Availability Period (as defined in the Domestic License Agreement) has yet been designated. UltraV will designate the second Availability Period (as defined in the Domestic License Agreement) for *Hector and the Search for Happiness*.

d.  Netflix paid the Debtors three million two hundred fifty thousand dollars ($3,250,000) by wire transfer of immediately available funds within five (5) business days following the Stipulation Effective Date (as defined in the Netflix Settlement).

e.  Netflix consented to the assumption and assignment to UltraV of the Netflix Agreements, subject only to the following: (a) following such assumption and assignment, UltraV shall not be required to comply with the obligation under Section 4.1.1 of the Domestic License Agreement to deliver a minimum number of Titles (as defined in the Domestic License Agreement) to Netflix in a given Year (as defined in the Domestic License Agreement) and shall not be liable to Netflix for any penalties for failure to deliver a minimum number of Titles (as defined in the Domestic License Agreement) in any given year under Section 9.2 of the Domestic License Agreement; (b) the parties agreed that Netflix shall provide reporting pursuant to Section 3.5 of the Domestic License Agreement, including, upon request, for periods preceding the date on which the Netflix Agreements are assigned to UltraV; and (c) *Samson* may be designated consistent with the terms of the Netflix Settlement.

f.  *Samson* is deemed not to have been designated in accordance with Section 4.4.3 of the Domestic License Agreement when it was designated on April 30, 2018, and the April 30, 2018 designation is withdrawn and is of no force or effect. Nonetheless, and notwithstanding anything in Section 4.4.2 of the Domestic License Agreement to the contrary, the Debtors or UltraV may provide written notice to Netflix in accordance with Section 4.4.3 of the Domestic License Agreement prior to August 31, 2018 designating

*Samson* under the Domestic License Agreement for a first Start Date (as defined in the Domestic License Agreement) that is at least 120 and not later than 180 calendar days subsequent to the date of such designation notice and Netflix shall not contest such designation on the basis of timeliness under Section 4.4.2 of the Domestic License Agreement, and Netflix shall accept such designation subject to the terms of the Domestic License Agreement.

g.   The Netflix Adversary Proceeding was dismissed and closed, Netflix is deemed to have waived collection of any amounts due on account of the California Judgment and Netflix consented to orders approving the Netflix Assumption Motion, the DIP Motion, the Notice of Assignment and Cure, the Sale Motion and the Global Settlement Motion.   Netflix's motion seeking relief from the automatic stay and all pleadings filed by Netflix in opposition to the motions discussed in this paragraph (g) were deemed to have been withdrawn with prejudice.

h.   Netflix (on behalf of itself, its predecessors, its affiliates, and its successors and assigns) forever and irrevocably remised, released, discharged and acquitted each of the Debtors and UltraV, their estates, their affiliates, their predecessors, and their successors and assigns, as well as each of the Debtors' and UltraV's respective current and former officers, directors, employees, agents, principals, representatives, owners, partners, shareholders, members, affiliates, managers, attorneys, heirs, agents, and advisors of and from any and all actions, complaints, causes of action, suits, demands, judgments, executions, issues, claims, disputes, assertions, allegations, arguments, defenses, objections, controversies, and/or injuries of every kind whatsoever (whether direct or indirect, at law or in equity, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, and whether in contract, tort, strict liability, or otherwise), including, without limitation, all costs and expenses relating thereto arising from, connected or related to, or caused by any event, occurrence, act, omission, cause or thing, of any type whatsoever, arising or existing, or occurring, in whole or in part, at any time from the beginning of the world through the date hereof relating in any way to the Netflix Agreements including, without limitation, matters that were asserted as or in support of Netflix's claims, contentions, or positions in connection with the Netflix Adversary Proceeding (including the Complaint and Amended Complaint), the Netflix Pre-Trial Brief, the Netflix Assumption Motion, the Netflix Pleadings, and the JPTO (each as defined in the Netflix Settlement); **provided, however**, that nothing in the Netflix Settlement released any term of the Netflix Settlement and provided further that the Netflix Agreements remain in full force and effect with respect to the

Parties' (as defined in the Netflix Settlement) performance and obligations thereunder following the date of the Netflix Settlement.

i.   The Debtors and UltraV, each on behalf of themselves, their estates, their predecessors, their affiliates, and their successors and assigns, forever and irrevocably remised, discharged and acquitted Netflix, its affiliates, its predecessors, and its successors and assigns, as well as each of Netflix's current and former officers, directors, employees, agents, principals, representatives, owners, partners, shareholders, members, affiliates, managers, attorneys, agents and advisors of and from any and all actions, complaints, causes of action, suits, demands, judgments, executions, issues, claims disputes, assertions, allegations, arguments, defenses, objections, controversies, and/or injuries of every kind whatsoever (whether direct or indirect, at law or in equity, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, and whether in contract, tort, strict liability, or otherwise), including, without limitation, all costs and expenses relating thereto arising from, connected or related to, or caused by any event, occurrence, act, omission, cause or thing, of any type whatsoever, arising or existing, or occurring, in whole or in part, at any time from the beginning of the world through the date hereof relating in any way to the Netflix Agreements including, without limitation, matters that were asserted by the Debtors or UltraV as or in support of their respective claims, contentions, or positions in connection with the Netflix Adversary Proceeding (including the Answer), the Relativity Pre-Trial Brief, the Netflix Assumption Motion, and the JPTO (each as defined in the Netflix Settlement); **provided**, **however**, that nothing in the Netflix Settlement released any term of the Netflix Settlement and provided further that the Netflix Agreements remain in full force and effect with respect to the Parties' (as defined in the Netflix Settlement) performance and obligations thereunder following the date of the Netflix Settlement, and any license fees owing under the Netflix Agreements for titles that have been submitted shall remain due.

j.   On October 16, 2018, Netflix paid $3,250,000 to the Debtors by wire transfer of immediately-available funds in satisfaction of its obligations under paragraph 2 of the Netflix Settlement.

## IV.    THE PLAN

The following summary highlights certain of the substantive provisions of the Plan and is not, nor is it intended to be, a complete description or a substitute for a full and complete review of the Plan.  The Plan Proponents strongly encourage all Holders of Claims and Interests to carefully read and study the Plan.

Section 1123 of the Bankruptcy Code provides that, except for administrative claims and priority tax claims, a plan must categorize claims against, and equity interests in, a debtor into individual classes. Although the Bankruptcy Code gives a debtor significant flexibility in classifying claims and interests, section 1123 of the Bankruptcy Code dictates that a plan may only classify a claim or equity interest with claims or equity interests, respectively, that are substantially similar.

The Plan establishes five (5) Classes of Claims and one (1) Class of Interests. These Classes take into account the differing nature and priority of Claims against the Debtors. Administrative Claims, including Professional Fee Claims, DIP Claims and Priority Tax Claims are not classified for purposes of voting or receiving Distributions under the Plan (as is permitted by section 1123 of the Bankruptcy Code) but are treated separately as unclassified Claims. Any valid administrative or priority claims against the 2015 Debtors, to the extent not discharged or otherwise satisfied pursuant to the 2016 Plan, are treated as Class 4 General Unsecured Claims under the Plan. No other claims against the 2015 Debtors are treated as valid claims under the Plan.

The Plan provides specific treatment for each Class, and only Impaired Holders of Claims that will receive Distributions under the Plan are entitled to vote on the Plan. The following discussion, which is qualified in its entirety by the terms of the Plan, sets forth the classification and treatment of all Claims against, and Interests in, the Debtors.

As described in Section III. E., during the pendency of the Chapter 11 Cases, the Debtors sold substantially of their assets to UltraV. Pursuant to the Sale Order and the Settlement Agreement following the closing of the Sale on and certain receipts and disbursements related to the Sale and Netflix Settlement, on October 21, 2018 the Debtors retained $4.760 million in cash to fund accrued but unpaid Administrative Expenses, Priority Claims and projected Administrative Expenses through the Effective Date (the "**Wind Down Amount**"). A budget reflecting the projected use of the Wind Down Amount from shortly after the closing of the Sale through the projected effective date of the Plan is attached hereto as **Exhibit B**. While this budget is an estimate only concerning projected future receipts and expenses, it reflects actual receipts and expenses through the week ending November 25, 2018. While the Debtors believe the budget reflects a good faith estimate of projected receipts and disbursements through confirmation of the Plan, there can be no guarantee that the actual receipts and disbursements will not vary, potentially materially, from the amounts projected.

The Wind Down Amount includes over $600,000 in contingencies for potential Administrative Expenses and Priority Claims in the event that the actual amount of such claims exceed the amounts projected by the Debtors. In addition to the cash amount for contingencies included in the Wind Down Amount, UltraV also provided a line of credit of up to $5000,000 (the "**Contingency Wind Down Line**") to cover Administrative Expenses and Priority Claims to the extent the Wind Down Amount proves insufficient.

If the Plan is confirmed on the timetable proposed by the Plan Proponents without any events that lead to a material increase in Administrative Expenses beyond those projected by the Debtors, the Debtors projections show that all Administrative Expenses and Priority Claims will

be satisfied without recourse to the Contingency Wind Down Line or to the other funds that will otherwise be available to fund the Liquidating Trust.

Any portion of the Wind Down Amount that is not used to pay Administrative Expenses or Priority Claims will be returned to UltraV. Thus, in addition to using the Wind Down Amount to pay Administrative Expenses and Priority Claims in full, the primary purpose of the Plan is to create a mechanism for the efficient administration of the Debtors' remaining assets for the benefit of holders of Class 4 General Unsecured Claims. Those assets consist primarily of the Retained Causes of Action and the following amounts (described in Article IV.5.c of this Disclosure Statement): (w) $400,000 that was deposited into a segregated account and will be transferred to the Liquidating Trust upon Confirmation, (x) the first $1,000,000 of Net Licensing Revenues and (y) 5%, up to another $1,000,000, of all Net Licensing Revenues in excess of $2,000,000. If Net Licensing Revenues are received consistent with projections, at Confirmation the Debtors project to have at least $1.4 million to transfer to the Liquidating Trust upon Confirmation.

The Plan contemplates that the Liquidating Trustee will then use these funds to investigate and prosecute (or otherwise resolve) the Retained Causes of Action, object to Claims, administer Distributions in accordance with the Plan and the Liquidating Trust Agreement and otherwise administer the Debtors' Chapter 11 Cases (without the constraints of a budget limiting the Liquidating Trustee's ability to perform such tasks). The Liquidating Trustee will have access to the Debtors' books and records necessary to complete the wind down. Pursuant to Section 2.2(b) of the Asset Purchase Agreement with UltraV, the Debtors retained all records they reasonably believe they will need in connection with the wind down. The Debtors are required to maintain these records for a period of six years, and UltraV is required to retain and provide access to the records sold to UltraV for one year.

## V.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

All Claims and Interests, except Administrative Claims, Professional Fee Claims, DIP Claims and Priority Tax Claims, are placed in the Classes set forth below. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other Classes.

If the Plan is confirmed by the Bankruptcy Court, unless a Holder of an Allowed Claim consents to different treatment, (a) each Allowed Claim in a particular Class will receive the same treatment as the other Allowed Claims in such Class, whether or not the Holder of such Claim voted to accept the Plan and (b) each Allowed Interest in a particular Class will receive the same treatment as the other Allowed Interests in such Class. Such treatment will be in exchange for and in full satisfaction, release and discharge of, the Holder's respective Claims against or Interests in a Debtor, except as otherwise provided in the Plan. Moreover, upon Confirmation, the Plan will be binding on (x) all Holders of Claims regardless of whether such Holders voted to accept the Plan and (y) all Holders of Interests.

A.    **Unclassified Claims**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, DIP Claims and Priority Tax Claims have not been classified and are thus excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

1.    *Administrative Claims*

Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Liquidating Trustee, as applicable, to the extent that an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim (other than Holders of Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of the Judicial Code) will receive in full and final satisfaction of their Allowed Administrative Claim an amount of Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim in accordance with the following:  (a) if such Administrative Claim is Allowed on or prior to the Effective Date, no later than 30 days after the Effective Date or as soon as reasonably practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter); (b) if such Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim; (d) at such time and upon such terms as may be agreed upon by the Holder of such Allowed Administrative Claim and the Debtors or the Liquidating Trustee, as applicable; or (e) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except for Professional Fee Claims and unless previously Filed, requests for the payment of Administrative Claims, other than Administrative Claims arising under section 503(b)(9) of the Bankruptcy Code and requests for payment of Administrative Claims arising on or prior to the Effective Date, must be Filed and served on the Debtors or the Liquidating Trustee, as applicable, no later than the Administrative Claim Bar Date and in accordance with the Plan and Confirmation Order.  Objections to requests for payment of Administrative Claims must be Filed and served on the Debtors or the Liquidating Trustee and the party requesting payment of an Administrative Claim by the Administrative Claim Objection Bar Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and prior Bankruptcy Court orders, the Allowed amounts, if any, of Administrative Claims shall be determined by, and satisfied in accordance with, an order of the Bankruptcy Court that becomes a Final Order.

Holders of Administrative Claims that are required to File and serve a request for payment of such Administrative Claims that do not File and serve such a request by the Administrative Claim Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors, the Liquidating Trust, and each of the foregoing party's property, and such Administrative Claims shall be deemed terminated as of the Effective Date without the need

30

for any objection from the Debtors or the Liquidating Trustee, as applicable, or any notice, action, order or approval of the Bankruptcy Court or any other Entity.

Any valid administrative or priority claims against the 2015 Debtors, to the extent not discharged or otherwise satisfied pursuant to the 2016 Plan, are treated as Class 4 General Unsecured Claims under the Plan. No other claims against the 2015 Debtors are treated as valid claims under the Plan.

## 2. *Professional Fee Claims*

### a. <u>*Final Fee Applications and Payment of Professional Fee Claims*</u>

All final requests for the payment of Professional Fee Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be Filed no later than 30 days after Confirmation, unless no final request for payment of such Professional Fee Claims is required pursuant to an order of the Bankruptcy Court. The Bankruptcy Court shall determine the Allowed amounts of such Professional Fee Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and prior Bankruptcy Court orders. When such Professional Fee Claims are Allowed by the entry of an order of the Bankruptcy Court, the Liquidating Trustee shall pay the amount of the Allowed Professional Fee Claims owing to the Professionals in Cash.

### b. <u>*Post-Confirmation Fees and Expenses*</u>

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice (other than notice to the Creditors' Committee) or any action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors, the Creditors' Committee or the Liquidating Trust. The Debtors (before the Effective Date) or the Liquidating Trustee shall pay, within 10 Business Days after submission of a detailed invoice to the Debtors or the Liquidating Trustee, such reasonable claims for compensation or reimbursement of expenses incurred by the Professionals retained by the Debtors and the Liquidating Trustee. If the Debtors, the Creditors' Committee or the Liquidating Trustee dispute the reasonableness of any such invoice, the Debtors, the Liquidating Trustee or the affected Professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice and the disputed portion of such invoice shall not be paid until the dispute is resolved. Upon Confirmation, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after the Effective Date shall terminate.

## 3. *DIP Claims*

The DIP Claims are Allowed and deemed to be Allowed Claims in the full amount outstanding under the DIP Note Documents, including principal, interest, fees and expenses. Pursuant to the Global Settlement Agreement, however, the DIP Lender has agreed to waive its right to receive any Distribution on account of any deficiency Claim relating to the DIP Note from

any of the Debtors' assets that do not constitute Purchased Assets and all such remaining claims shall be deemed to be avoided for the benefit of the Estates.

### 4. *Prepetition Secured Note Claims*

The Prepetition Secured Note Claims are Allowed and deemed to be Allowed Claims in the full amount outstanding under the Prepetition Secured Note Documents, including principal, interest, fees and expenses. Pursuant to the Global Settlement Agreement, however, the Prepetition Secured Note Lender has agreed to waive its right to receive any Distribution on account of any deficiency Claim relating to the Prepetition Secured Note from any of the Debtors' assets that do not constitute Purchased Assets and all such remaining claims shall be deemed to be avoided for the benefit of the Estates.

### 5. *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, and release of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## B.    **Classified Claims and Interests**

Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth in Article III of the Plan for all purposes, including, but not limited to, voting, Confirmation and Distributions pursuant to the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. The classification of Claims and Interests against each Debtor pursuant to the Plan is set forth below.

| Class | Designation | Status | Entitled to Vote |
|-------|-------------|--------|------------------|
| 1 | Secured Tax Claims | Unimpaired | Deemed to accept the Plan and not entitled to vote. |
| 2 | Other Secured Claims | Unimpaired | Deemed to accept the Plan and not entitled to vote. |
| 3 | Other Priority Claims | Unimpaired | Deemed to accept the Plan and not entitled to vote. |
| 4 | General Unsecured Claims | Impaired | Entitled to vote on the Plan. |
| 5 | Intercompany Claims | Impaired | Deemed to reject the Plan and not entitled to vote. |
| 6 | Interests | Impaired | Deemed to reject the Plan and not entitled to vote. |

C.    **Treatment of Classified Claims and Interests**

1.    *Class 1 – Secured Tax Claims*

    a.    **Classification**.  Class 1 consists of all Secured Tax Claims.

    b.    **Treatment**.  Except to the extent that a Holder of an Allowed Secured Tax Claim has agreed to less favorable treatment, each Holder of an Allowed Secured Tax Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to the Allowed amount of such Claim.

    c.    **Impairment and Voting**.  Class 1 is Unimpaired and not entitled to vote.

2.    *Class 2 – Other Secured Claims*

    a.    **Classification**.  Class 2 consists of all Other Secured Claims.

    b.    **Treatment**.  This Class shall be subdivided so that each Holder of an Other Secured Claim is in a Class by itself except to the extent there are Other Secured Claims that are substantially similar to each other and may be included in a single Class, and except for a precautionary class of otherwise unclassified Other Secured Claims. On the Effective Date or as soon thereafter as is practicable in recognition of the Claims reconciliation process set forth herein, each Holder of an Allowed Other Secured Claim shall receive, in full satisfaction, settlement and release of, an in exchange for, such Allowed Other Secured Claim, the collateral securing any such Allowed Other Secured Claim; **provided**, **however**, that such collateral shall not include collateral that (a) secured, on a senior basis, the DIP Note or the Prepetition Secured Note or (b) constitutes a Purchased Asset.  Any deficiency claim of a holder of an Allowed Other Secured Claim shall not constitute a Class 2 Claim and shall be treated as a Class 4 General Unsecured Claim hereunder. As a result of the Sale, there is no collateral remaining to secure the liens or claims held by Holders of Other Secured Claims, thereby rendering such Claims wholly unsecured deficiency claims.  While certain Holders of such Claims may continue to have recourse as against the Purchaser pursuant to the Asset Purchase Agreement and the Sale Order, as to the Debtors' Estates and the Plan, such deficiency claims are entitled to vote on the Plan as members of Class 4, *i.e.*, General Unsecured Claims.  The Debtors therefore expect that there will be no claims entitled to be treated as Other Secured Claims.

    c.    **Impairment and Voting**.  Class 2 is Unimpaired and not entitled to vote.

3.      *Class 3 – Other Priority Claims*

    a.      **Classification**.  Class 3 consists of all Other Priority Claims.

    b.      **Treatment**.   On the Effective Date or as soon thereafter as reasonably practicable in recognition of the Claims reconciliation process set forth herein, the Holder of an Allowed Other Priority Claim shall receive on account of the Allowed Other Priority Claim, in full satisfaction, settlement and release of, and in exchange for, such Allowed Other Priority Claim either:  (a) Cash equal to the amount of such Allowed Other Priority Claim or (b) such other treatment as to which the Debtors or Liquidating Trustee (as applicable) and the Holder of such Allowed Other Priority Claim have agreed upon in writing.

    c.      **Impairment and Voting**.  Class 3 is Unimpaired and not entitled to vote.

4.      *Class 4 – General Unsecured Claims*

    a.      **Classification**.  Class 4 consists of all General Unsecured Claims. Any holders of validly existing administrative or priority claims Any valid administrative or priority claims against the 2015 Debtors, to the extent not discharged or otherwise satisfied pursuant to the 2016 Plan, are treated as Class 4 General Unsecured Claims under the Plan.

    b.      **Treatment**.  On the Effective Date or as soon thereafter as practicable in recognition of the Claims reconciliation process, each Holder of an Allowed General Unsecured Claim shall receive, in full satisfaction, settlement and release of, and in exchange for, such Allowed General Unsecured Claim, its Pro Rata portion of the beneficial interests in the Liquidating Trust.

    c.      **Impairment and Voting**.  Class 4 is impaired and entitled to vote.

5.      *Class 5 – Intercompany Claims*

    a.      **Classification.**  Class 5 consists of all Intercompany Claims.

    b.      **Treatment**.  Holders of Intercompany Claims will not receive any distributions under the Plan on account of their Intercompany Claims and, on the Effective Date, such Intercompany Claims will be cancelled.

    c.      **Impairment and Voting**.  Class 5 is impaired, will receive no property under the Plan and is not entitled to vote.

34

6.    *Class 6 – Interests*

a.    **Classification**.   Class 6 consists of all Interests in any of the Debtors.

b.    **Treatment**.  Holders of Interests will not receive or retain any Interests under the Plan and, on the Effective Date, such Interests will be cancelled.

c.    **Impairment and Voting**.  Class 6 is impaired, will receive no property under the Plan and is not entitled to vote.

### D.    <u>Special Provision Governing Unimpaired Claims</u>

Except as otherwise provided in the Plan, nothing in the Plan shall affect the Plan Proponents' or the Liquidating Trust's rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Claims.

### E.    <u>Elimination of Vacant Classes</u>

Pursuant to section 1129(a)(8) of the Bankruptcy Code, any Class of Claims or Interests that does not have (a) a Holder of an Allowed Claim or Allowed Interest or (b) a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing, shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan.

### F.    <u>Acceptance or Rejection of the Plan</u>

1.    *Presumed Acceptance*.  Claims in Classes 1, 2 and 3 are Unimpaired under the Plan.  The Holders of such Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

2.    *Voting Classes*.  Claims in Class 4 are Impaired under the Plan, and the Holders of such Claims are entitled to vote to accept or reject the Plan.  If Holders of Claims in a particular Impaired Class of Claims are given the opportunity to vote to accept or reject the Plan but no Holders of Claims in such Impaired Class of Claims vote to accept or reject the Plan, such Class of Claims shall be deemed to have accepted the Plan.

3.    *Deemed Rejection*.  Classes 5 and 6 are Impaired, and Holders of such Claims and Interests shall receive no Distributions.  The Holders in such Classes are deemed to have rejected the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

### G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one (1) Impaired Class of Claims. The Plan Proponents shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Plan Proponents reserve the right to modify the Plan in accordance with Article IX of the Plan to the extent that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

### H.    Subordinated Claims

The allowance, classification and treatment of all Allowed Claims and Interests and the respective Distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a) or 510(b) of the Bankruptcy Code or otherwise.

### I.    Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### J.    Procedures for Resolving Contingent, Unliquidated and Disputed Claims

#### 1.    *Allowance of Claims*

After the Effective Date, the Liquidating Trustee shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim or Interest immediately before the Effective Date.

#### 2.    *Liquidating Trustee's Responsibilities*

Except as otherwise specifically provided in the Plan, after the Effective Date, the Liquidating Trustee shall have the sole authority to: (a) File, withdraw or litigate to judgment objections to Claims; (b) settle or compromise any Disputed Claim without any further notice or any action, order or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice or any action, order, or approval by the Bankruptcy Court.

#### 3.    *Estimation of Claims*

Before or after the Effective Date, the Debtors or the Liquidating Trustee, as applicable, may, but are not required to, at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason,

regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars ($0), unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of Distributions), and the Liquidating Trustee may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim or Interest.

4.    *Adjustment to Claims Without Objection*

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan), may be adjusted or expunged (including on the Claims Register, to the extent applicable) by the Liquidating Trustee without an objection to such Claim or Interest having to be Filed and without any further notice or any action, order, or approval of the Bankruptcy Court.

5.    *Time to File Objections to Claims*

Any objections to Claims shall be Filed on or before 180 days after the Effective Date, subject to the extension of the deadline for objecting to such Claims by order of the Bankruptcy Court.

6.    *Disallowance of Claims*

Any Claims held by (a) Entities from which property is recoverable under sections 542, 543, 550 or 553 of the Bankruptcy Code or (b) a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any Distributions on account of such Claims until such time as any Retained Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Liquidating Trustee. All Claims Filed on account of an indemnification obligation to a director, manager, officer, or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice or action, order, or approval of the Bankruptcy Court.

Except as provided herein or otherwise agreed, all Proofs of Claim Filed after the Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice or any action, order or approval of the Bankruptcy Court, and Holders of such Claims may not receive any Distributions on account of such Claims, unless such late Claim has been deemed timely Filed by a Final Order on or before the Confirmation Hearing.

7.      *Amendments to Claims*

On or after the applicable Bar Date, a Claim shall not be Filed or amended without prior authorization from the Bankruptcy Court or the Liquidating Trustee.  Absent such authorization, any new or amended Claim Filed shall be deemed disallowed in full and expunged without any further action.

8.      *No Distributions Pending Allowance*

If an objection to a Claim or portion thereof is Filed as set forth in Article VII.E of the Plan, no payment or Distribution provided under the Plan shall be made on account of such Claim or portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

9.      *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim or an Allowed Interest, Distributions, if any, shall be made to the Holder of such Allowed Claim or Allowed Interest in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court Allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the Distribution, if any, to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.

## VI.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    <u>Assumption and Rejection of Executory Contracts and Unexpired Leases</u>

On the Effective Date, except as otherwise provided in the Asset Purchase Agreement with regard to Assumed Contracts (as defined in the Asset Purchase Agreement) that have not been assigned but are designated for potential assignment to the Purchaser, each Executory Contract or Unexpired Lease not previously assumed, assumed and assigned or rejected shall be deemed automatically rejected on the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease (a) is a contract, release or other agreement or document assumed or entered into in connection with the Plan or (b) is a directors' and officers' insurance policy (which policy shall be deemed assumed and transferred to the Liquidating Trust under the Plan).

Confirmation shall, subject to and upon the occurrence of the Effective Date, constitute a Bankruptcy Court order approving the assumption, assumption and assignment or rejection of the Executory Contracts and Unexpired Leases assumed, assumed and assigned or rejected pursuant to the Plan; **provided**, **however**, that neither the Plan nor the Confirmation Order shall be construed as limiting the Debtors' authority to assume and assign to the Purchaser the Assumed Contracts (as defined in the Asset Purchase Agreement), including, without limitation, any Assumed Contracts (as defined in the Asset Purchase Agreement) that are listed as potentially being designated for assumption and assignment but are not designated for assumption and assignment until after the Effective Date in accordance with the Asset Purchase Agreement.  Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall

be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Each Executory Contract and Unexpired Lease assumed pursuant to Article VI.A of the Plan or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Effective Date, shall vest in the Liquidating Trust and be fully enforceable by the Liquidating Trustee in accordance with its terms, except as such terms that are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

## B.   Directors and Officers Insurance Policies

All directors and officers insurance policies shall be assumed by the Debtors on behalf of the applicable Debtor and transferred to the Liquidating Trust effective as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such insurance policy was previously rejected by the Debtors pursuant to a Bankruptcy Court order or is the subject of a motion to reject pending on the Effective Date, and coverage for defense and indemnity under any such policies shall remain available to all individuals within the definition of "Insured" in any such policies.

## C.   Claims Based on the Rejection of Executory Contracts or Unexpired Leases

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within 30 days after the later of (a) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (b) the effective date of such rejection or (c) the Effective Date. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed and forever barred from assertion, and shall not be enforceable against the Debtors or the Liquidating Trust, the Estates or the foregoing parties' property without the need for any objection by the Liquidating Trustee, any further notice or any action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied and released, notwithstanding anything in the Schedules or a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as Unsecured Claims.

## D.   Cure of Defaults for Executory Contracts and Unexpired Leases Assumed

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitations described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (a) the amount of any payments to cure such a default, (b) the ability of the Liquidating Trustee or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (c) any other matter pertaining to assumption or the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving the assumption. On

or before December ___, 2018, the Debtors shall provide notices of proposed assumption and proposed cure amounts to applicable third-parties.  Such notices shall contain procedures for objecting and resolving disputes with the Bankruptcy Court.  **Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be Filed, served and actually received by the Debtors on or before January ___, 2019 at 4:00 p.m. (Eastern Time)**.  Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.  For the avoidance of doubt, the assumption and assignment of the Assumed Contracts (as defined in the Asset Purchase Agreement) shall be authorized and governed by the Sale Order, and, in the event of any inconsistency between the Plan and the Sale Order concerning the assumption and assignment of the Assumed Contracts (as defined in the Asset Purchase Agreement), the terms of the Sale Order shall govern and control.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice or any action, order or approval of the Bankruptcy Court.

### E.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection of an Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or the Liquidating Trust, as applicable, under such Executory Contracts or Unexpired Leases.

### F.    Modifications, Amendments, Supplements, Restatements or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements have been previously rejected or repudiated or are rejected or repudiated under the Plan.

Modifications, amendments, supplements and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority or amount of any Claims that may arise in connection therewith.

### G.    Reservation of Rights

Nothing contained in the Plan shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors or the Liquidating Trust have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Liquidating Trustee, as applicable, shall have 30 days following the entry of a Final Order resolving such dispute to alter its treatment of such contract or lease under the Plan.

### H.    Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## VII.   SUBSTANTIVE CONSOLIDATION

In order facilitate timely transfer of assets and liabilities and Distributions under the Plan (among other things), the Plan is conditioned on the Bankruptcy Court ordering, through the Confirmation Order, the substantive consolidation of the Debtors' Estates into a single Estate. Pursuant to the Confirmation Order:  (a) all Retained Assets and liabilities of the consolidated Debtors will be deemed to be merged for purposes of transferring the Retained Assets to the Liquidating Trust and Distributions; (b) the obligations of each Debtor will be deemed to be the obligations of the consolidated Estate for purposes of Distributions; (c) any Claims Filed or to be Filed in connection with any such obligations will be deemed Claims against the consolidated Estate; (d) each Claim Filed in the Chapter 11 Case of any Debtor will be deemed Filed against the Debtors in the consolidated Chapter 11 Cases; (e) all transfers, disbursements and Distributions made by the Liquidating Trust will be deemed to be made by the consolidated Debtors; and (f) all guarantees of the Debtors of the obligations of any other Debtors will be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors will be deemed to be one obligation of the consolidated Estate.  Holders of Allowed Claims in each Class shall be entitled to their share of assets available for Distribution to such Class without regard to which Debtor was originally liable for such Claim.

Notwithstanding the foregoing, the Plan provides a specific exemption to the consolidation of specific liabilities that were intended to be "non-recourse" when incurred.  This exception to substantive consolidation does not apply to claims that are inherently non-recourse to all the Debtors simply because not all Debtors are obligors, but instead applies only to claims that were intended to be limited to a discreet asset or pool of assets.  The Plan indicates that it shall not modify any contractual agreement by which a liability of one Debtor was expressly intended to be non-recourse as to the assets of any affiliated Debtors.  Accordingly, to the extent that the liability of any Debtor is, by its express terms, non-recourse as to the assets of any affiliated Debtors, such liability shall not be substantively consolidated under the Plan and the Holder of such claim shall receive a beneficial interest in the Liquidating Trust that is limited to (a) such Holder's Pro Rata portion of  the Allowed Claims of the Debtor that is liable on such Claim multiplied by (b) the value of the Retained Assets of the Debtor that is liable on such Claim. The Committee put this

language into the Plan specifically to address the claims of RKA that relate to notes issued to RKA in the 2016 Plan, which it believes were expressly intended to constitute secured non-recourse obligations related to specific film assets. This language is intended to apply only to the claims of RKA. The Plan does not constitute a determination that the claims of RKA or any other entity is non-recourse as to the assets of any affiliated Debtors; accordingly, there can be no guarantee that the claims of RKA will not be included in Class 4 General Unsecured Claims. Intercompany Claims and Interests will receive no distributions and will be treated in accordance with the Plan (as described above).

Notwithstanding the foregoing, such consolidation shall not affect (a) the legal and entity structure of the Liquidating Trust, (b) any obligations under any contracts, licenses, or leases that were entered into during the Chapter 11 Cases or Executory Contracts or Unexpired Leases that have been or will be assumed and assigned pursuant to the Sale Agreement or the Plan, (c) distributions from any insurance policies or proceeds of such policies, or (d) the vesting of the Retained Assets in the Liquidating Trust. Moreover, the substantive consolidation proposed in the Plan will not affect the Liquidating Trustee's obligation to file the necessary operating reports and pay any required fees pursuant to 28 U.S.C. § 1930(a)(6), which obligation shall continue until a Final Order is entered closing, dismissing or converting each Debtor's Chapter 11 Case. For the avoidance of doubt, the Debtors anticipate that the Liquidating Trustee will seek the immediate dismissal of all cases other than (a) *In re Relativity Media, LLC*, Case No. 18-11358 and (b) *Netflix, Inc. v. Relativity Media, LLC and RML Distribution Domestic, LLC*, No. 18-01552.

## VIII.  VOTING REQUIREMENTS

The Disclosure Statement Order approved certain procedures for the Plan Proponents' solicitation of votes to approve the Plan, including setting Voting Deadline, establishing which Holders of Claims or Interests are eligible to receive Ballots to vote on the Plan and certain other voting procedures. The Disclosure Statement Order is hereby incorporated by reference as though fully set forth herein. You should read the Disclosure Statement Order, the Confirmation Hearing Notice and the instructions attached to your Ballot in connection with this Article VIII as they set forth in detail, among other things, procedures governing the Voting Deadline and objecting to the Plan.

If you have any questions about the procedure for voting your Claim or the Solicitation Package you received, or if you wish to obtain a paper copy of the Plan, the Disclosure Statement or any exhibits to such documents, please contact the Voting Agent (a) by telephone at (866) 355-3940 (for domestic or Canadian callers) or (323) 406-6362 (for international callers), (b) by email at relativityballots@primeclerk.com or (3) in writing at *Relativity Media Ballots*, c/o Prime Clerk LLC, 830 3rd Avenue, 3rd Floor, New York, NY 10022.

### A.  <u>Voting Deadline</u>

This Disclosure Statement and the Ballots are being distributed to all Holders of Claims that are entitled to vote on the Plan. In order to facilitate vote tabulation, there is a separate Ballot designated for each Impaired Voting Class; however, all Ballots are substantially similar in form and substance, and the term "Ballot" is used without intended reference to the Ballot of any specific Class of Claims.

In accordance with the Disclosure Statement Order, in order to be considered for purposes of accepting or rejecting the Plan, all Ballots must be received by the Voting Agent by the Voting Deadline (i.e., 4:00 p.m. (Eastern Time) on January ___, 2019). Only those Ballots actually received by the Voting Agent before the Voting Deadline will be counted as either accepting or rejecting the Plan. For detailed voting instructions, see the Disclosure Statement Order.

### B.    Holders Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is deemed to be "impaired" under a plan unless (a) the plan leaves unaltered the legal, equitable and contractual rights to which such claim or equity interest entitles the holder thereof; or (b) notwithstanding any legal right to an accelerated payment of such claim or equity interest, the plan (i) cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy), (ii) reinstates the maturity of such claim or equity interest as it existed before the default, (iii) compensates the holder of such claim or equity interest for any damages resulting from such holder's reasonable reliance on such legal right to an accelerated payment and (iv) does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

In general, a holder of a claim or equity interest may vote to accept or reject a plan if (a) the claim or equity interest is "allowed," which means generally that it is not disputed, contingent or unliquidated, and (b) the claim or equity interest is impaired by a plan. However, if the holder of an impaired claim or equity interest will not receive any distribution under the plan on account of such claim or equity interest, the Bankruptcy Code deems such holder to have rejected the plan and provides that the holder of such claim or equity interest is not entitled to vote on the plan. If the claim or equity interest is not impaired, the Bankruptcy Code conclusively presumes that the holder of such claim or equity interest has accepted the plan and provides that the holder is not entitled to vote on the plan.

Except as otherwise provided in the Disclosure Statement Order, the Holder of a Claim against one or more Debtors that is Impaired under the Plan is entitled to vote to accept or reject the Plan if (a) the Plan provides a Distribution in respect of such Claim; (b) the Claim has been scheduled by the appropriate Debtor (and is not scheduled as disputed, contingent or unliquidated) and (c) the Holder of such Claim has timely Filed a Proof of Claim or a Proof of Claim was deemed timely Filed by an order of the Bankruptcy Court prior to the Voting Deadline.

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Disclosure Statement Order also sets forth assumptions and procedures for determining the amount of Claims that each creditor is entitled to vote in these Chapter 11 Cases and how votes will be counted under various scenarios.

### C.    Vote Required for Acceptance by a Class

A Class of Claims will have accepted the Plan if it is accepted by at least two-thirds in amount and more than one-half in number of the Allowed Claims in such Class that have voted on the Plan in accordance with the Disclosure Statement Order.

## IX.    CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

Among the requirements for confirmation of the Plan are that the Plan be (a) accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Plan "not discriminate unfairly" and be "fair and equitable" as to such Class, (b) feasible and (c) in the "best interests" of creditors and stockholders that are Impaired under the Plan.

1.    *Acceptance*

A moneyed, business, commercial corporation or trust must satisfy the following requirements pursuant to section 1129(a) of the Bankruptcy Code before the bankruptcy court may confirm its plan:

- The plan complies with the applicable provisions of the Bankruptcy Code.

- The proponent of the plan complies with the applicable provisions of the Bankruptcy Code.

- The plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the proponent, by the debtor or by a person issuing securities or acquiring property under a plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by or is subject to the approval of, the Bankruptcy Court as reasonable.

- The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor or a successor to the debtor under the plan, and the appointment to, or continuance in, such office of such individual must be consistent with the interests of creditors and equity security holders and with public policy.

- The proponent of the plan has disclosed the identity of any insider (as defined in section 101 of the Bankruptcy Code) that will be employed or retained by the debtor, and the nature of any compensation for such insider.

- Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

- With respect to each impaired class of claims or interests:

  o each holder of a claim or interest of such class (a) has accepted the plan; or (b) will receive or retain under the plan on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the

44

amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date; or

o   if section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim, property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

- With respect to each class of claims or interests, such class has (a) accepted the plan; or (b) such class is not impaired under the plan (subject to the "cramdown" provisions discussed below).

- Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

o   with respect to a claim of a kind specified in sections 507(a)(2) or 507(a)(3) of the Bankruptcy Code, on the effective date of the plan, the holder of the claim will receive, on account of such claim, Cash equal to the allowed amount of such claim, unless such holder consents to a different treatment;

o   with respect to a class of claims of the kind specified in sections 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of the Bankruptcy Code, each holder of a claim of such class will receive (a) if such class has accepted the plan, deferred cash payments of a value, on the effective date of the plan, equal to the allowed amount of such claim; or (b) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim, unless such holder consents to a different treatment;

o   with respect to a claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, unless the holder of such a claim consents to a different treatment, the holder of such claim will receive on account of such claim, regular installment payments in cash, of a total value, as of the effective date of the plan, equal to the allowed amount of such claim over a period ending not later than five (5) years after the date of the order for relief under sections 301, 302 or 303 of the Bankruptcy Code and in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b) of the Bankruptcy Code); and

o   with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8) of the Bankruptcy Code, but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in the immediately preceding bullet points above.

45

- If a class of claims is impaired under the plan, at least one (1) class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider (as defined in section 101 of the Bankruptcy Code).

- Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

- All fees payable under 28 U.S.C. § 1930, as determined by the bankruptcy court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

- The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to section 1114(e)(1)(B) or (g) of the Bankruptcy Code, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

The Debtors believe that the Plan meets each of the requirements of section 1129(a) of the Bankruptcy Code other than those pertaining to voting, which has not yet taken place.

### 2. *Feasibility*

In connection with Confirmation, the Bankruptcy Court must determine that the Plan is feasible in accordance with section 1129(a)(11) of the Bankruptcy Code, which requires that Confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors. The Plan contemplates that all Retained Assets of the Debtors will be liquidated, sold, transferred, abandoned or otherwise disposed of, and all proceeds of the Retained Assets will be distributed to the Holders in accordance with the Plan and the Liquidating Trust Agreement. Since no further financial reorganization of the Debtors will be possible or is contemplated, the Plan Proponents believe that the Plan meets the feasibility requirement. In addition, subject to Article XI of this Disclosure Statement and as described in Article IV of this Disclosure Statement regarding the Wind Down Amount, the Plan Proponents believe that sufficient funds will exist at the Effective Date to make all payments required to be made on the Effective Date, and that such payment will be made from the Wind Down Amount (and if necessary, the Contingency Wind Down Line) without the need to expend any of the $1.4 million in funds projected to be funded to Liquidating Trust on the Effective Date.

### 3. *Best Interests of Creditors*

Section 1129(a)(7) of the Bankruptcy Code requires that any holder of an impaired claim or interest voting against a plan must be provided in the plan with a value, as of the effective date of the plan, at least equal to the value that the holder would receive if the debtor's assets were liquidated under chapter 7 of the Bankruptcy Code. To determine what the holders of claims and interests in each impaired class would receive if the debtors' assets were liquidated, the bankruptcy court must determine the dollar amount that would be generated from a liquidation of the debtor's

assets in the context of a hypothetical liquidation. Such a determination must take into account the fact that secured claims (and any administrative claims resulting from the chapter 11 cases and from the chapter 7 cases) would have to be paid in full from the liquidation proceeds before the balance of those proceeds were made available to pay unsecured creditors and make distributions (if any) to holders of interests.

As discussed in Article II.F of this Disclosure Statement, after the 2015 Debtors emerged from bankruptcy, Relativity unsuccessfully engaged in various efforts to secure the debt or equity capital necessary to execute on its business plan after it reorganized in 2016. As a result of these efforts, industry participants have been well aware of the Debtors' assets and the opportunities that they present. However, the only bid that the Debtors received for substantially all of their assets was the credit bid from UltraV.

The Debtors have already liquidated substantially all their assets through the Sale to UltraV. Administrative Expenses and Priority Claims are projected to be paid entirely from the Wind Down Amount, and the balance of the Wind Down Amount, if any, will be returned to UltraV. Thus the best interests of creditors test is satisfied if the remaining assets will be administered and distributed in a manner that will lead to greater recoveries to General Unsecured Claims through the Plan than they would receive in a chapter 7 liquidation.

Those assets consist primarily of the Retained Causes of Action and cash. The Plan Proponents believe the liquidation of these assets through a conversion to chapter 7 could lead to additional administrative expenses incurred by a trustee or trustees and attorneys, accountants and other professionals to assist such trustee beyond those that will be incurred by a the Liquidating Trustee, as (i) the Liquidating Trustee will have background knowledge of the Debtors from the process of being selected and retained to serve as Liquidating Trustee, and (ii) the Plan Proponents will consider the ability of any proposed Liquidating Trustee to administer the assets in an efficient manner in selecting the Liquidating Trustee.

The Plan Proponents also believe that conversion of the Debtors from chapter 11 to chapter 7 of the Bankruptcy Code would result in a significant delay in distributions to all creditors who would have received a distribution under the Plan. Lastly, the liquidation of the remaining assets by a Liquidating Trustee will avoid the expense of statutory fees to the chapter 7 trustee. Accordingly, the Plan Proponents believe that the Holders of Claims and Interests in each impaired Class will receive more under the Plan than if these Chapter 11 Cases were converted to chapter 7 cases and each Debtor's assets were liquidated under the direction of a chapter 7 trustee.

4.    *Cramdown - Confirmation Without Acceptance of All Impaired Classes*

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as (a) the plan otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted the plan without taking into consideration the votes of any insiders in such class and (c) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan. These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

a.    *"Fair and Equitable"*

The Bankruptcy Code establishes different "cramdown" tests for determining whether a plan is "fair and equitable" to dissenting impaired classes of secured creditors, unsecured creditors and equity interest holders.

- **Secured Creditors**. A plan is fair and equitable to a class of secured claims that rejects the plan if the plan provides: (a) that each holder of a secured claim included in the rejecting class (i) retains the liens securing its claim to the extent of the allowed amount of such claim, whether the property subject to those liens is retained by the debtor or transferred to another entity and (ii) receives on account of its secured claim deferred cash payments having a present value, as of the effective date of the plan, at least equal to such holder's interest in the estate's interest in such property; (b) that each holder of a secured claim included in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim; or (c) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens with such liens to attach to the proceeds of the sale, and the treatment of such liens on proceeds is in accordance with clause (a)(i) or (a)(ii) of this paragraph.

- **Unsecured Creditors**. A plan is fair and equitable as to a class of unsecured claims that rejects the plan if the plan provides that: (a) each holder of a claim included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan, equal to the amount of its allowed claim; or (b) the holders of claims and interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan on account of such junior claims or interests.

- **Holders of Interests**. A plan is fair and equitable as to a class of interests that rejects the plan if the plan provides that: (a) each holder of an equity interest included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of (i) any fixed liquidation preference to which such holder is entitled, (ii) any fixed redemption price to which such holder is entitled or (iii) the value of the interest; or (b) the holder of any interest that is junior to the interests of the rejecting class will not receive or retain any property under the plan on account of such junior interest.

The Plan Proponents believe the Plan is fair and equitable as to unsecured creditors and Holders of Interests because no Holders of Claims or Interests junior to such parties are receiving any Distributions under the Plan on account of such Claims or Interests. To the extent that any of the Debtors' secured creditors are Impaired, the Plan Proponents anticipate that they will vote in favor of the Plan.

b.    *"Unfair Discrimination"*

A plan does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other classes similarly situated, and no class receives more than it is legally entitled

to receive for its claims or interests. The Debtors carefully designed the Plan, including calculating the distributions to Holders of General Unsecured Claims against each of the Debtors, to ensure recoveries on account of Claims in a particular Class against each of the Debtors did not result in unfair discrimination among similarly situated Classes. The Debtors do not believe that the Plan discriminates unfairly against any impaired Class of Claims or Interests.

The Plan Proponents believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for "cramdown" or non-consensual Confirmation pursuant to section 1129(b) of the Bankruptcy Code.

### B.    Alternatives to Confirmation and Consummation of the Plan

If the requisite acceptances are not received or if the Plan is not confirmed, the Debtors could attempt to formulate and propose different plans. However, the Plan Proponents have evaluated alternatives to the Plan and the only real prospect is an orderly liquidation of assets. In a chapter 7 liquidation, a trustee is elected or appointed to liquidate the debtor's assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code. Further, because there are multiple separate Debtors, there could be multiple chapter 7 trustees – one for each Debtor – whose interests and obligations conflict. This, in turn, would result in additional legal and other expenses.

It is impossible to predict precisely how the proceeds of a chapter 7 liquidation would be distributed to the respective Holders of Claims against or Interests in the Debtors. The Plan Proponents believe that in a liquidation under chapter 7, before prepetition unsecured creditors receive any distributions, additional administrative expenses incurred by a trustee or trustees and attorneys, accountants and other professionals to assist such trustee(s) would cause a substantial diminution in the value of the Estates. Additionally, the Plan Proponents believe that conversion of the Debtors from chapter 11 to chapter 7 of the Bankruptcy Code would result in (a) a significant delay in distributions to all creditors who would have received a distribution under the Plan and (b) diminished recoveries for Holders of Impaired Claims. A hypothetical liquidation analysis, setting forth the analysis of potential factors and, therefore, costs of a chapter 11 versus chapter 7, is attached as **Exhibit C**. Accordingly, the Plan Proponents believe that the Plan is superior to a chapter 7 liquidation.

### X.    MEANS OF IMPLEMENTATION

### A.    Conditions to Plan Effectiveness

As a condition to the effectiveness of the Plan, on or prior to the Effective Date, each of the following must occur:

1.    all actions, documents and agreements necessary to implement the Plan shall be effected or executed;

2.    the Plan Proponents will have received all authorizations, consents, rulings, opinions or other documents that are determined by the Plan Proponents to be necessary to implement the Plan;

          3.     the Confirmation Order shall include authorization of the limited substantive consolidation of the Debtors' Estates in accordance with Article IV of the Plan;

          4.     the Liquidating Trust Agreement shall be final and approved, the Liquidating Trustee shall be appointed and the Liquidating Trust shall be funded in accordance with the Plan;

          5.     the Plan Proponents shall have determined in their reasonable discretion that sufficient Cash exists to satisfy all Allowed Administrative Claims, Professional Fee Claims, Secured Tax Claims, Other Secured Claims and Other Priority Claims; and

          6.     the Plan Proponents shall have made all Distributions required to be made on or before the Effective Date.

The Plan will not be consummated or become binding unless and until the Effective Date occurs, which shall in all events occur prior to the date that is 30 days following the entry of the Confirmation Order unless such date is extended by Order of the Bankruptcy Court for good cause shown. The Effective Date will be the first Business Day on which the following conditions have been satisfied: (a) the Confirmation Order shall have become a Final Order; and (b) each of the conditions above (A.1-A.6) have been satisfied.

In no event shall the Effective Date occur more than 30 calendar days following the entry of the Confirmation Order unless the Confirmation Order is stayed or the Plan is modified pursuant to an order of the Bankruptcy Court extending the Effective Date for good cause shown.

### B.     Waiver of Conditions

The Plan Proponents may, in their reasonable discretion, waive any of the conditions set forth in Article V.B of the Plan without notice and a hearing. The failure to satisfy any condition may be asserted by the Plan Proponents as a basis to allege that the Effective Date has not occurred regardless of the circumstances giving rise to the failure of such condition to be satisfied (including, without limitation, any act, action, failure to act, or inaction by the Debtors). If the Plan Proponents fail to assert the non-satisfaction of any such conditions, such failure will not be deemed a waiver of any other rights thereunder.

### C.     Effect of Failure of Conditions

If the Consummation does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (a) constitute a waiver or release of any Claims by the Debtors, any Holders of Claims or Interests, or any other Entity; (b) prejudice in any manner the rights of the Debtors, any Holders of Claims or Interests, or any other Entity; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect. Notwithstanding the foregoing, the non-Consummation shall not require or result in the voiding, rescission, reversal or unwinding of the Sale Order.

D.    **Corporate Action**

Upon the Effective Date, all transactions and applicable matters provided for under the Plan will be deemed to be authorized and approved by the Debtors without any further action by the Debtors, the Debtors' shareholders or the Debtors' board of directors.

E.    **Vesting of Assets**

Unless otherwise expressly provided under the Plan, on the Effective Date, the Retained Assets will vest in the Liquidating Trust free and clear of all claims, liens, encumbrances, charges and other interests.  On and after the Effective Date, the transfer of the Retained Assets from the Estates to the Liquidating Trust will be deemed final and irrevocable and Distributions may be made from the Liquidating Trust.  In connection with the foregoing:  (a) on the Effective Date, the appointment of the Liquidating Trustee shall become effective and the Liquidating Trustee shall begin to administer the Liquidating Trust pursuant to the terms of the Liquidating Trust Agreement and the Plan and may use, acquire and dispose of Liquidating Trust Assets free of any restrictions imposed under the Bankruptcy Code; (b) the Confirmation Order will provide the Liquidating Trustee with express authority to convey, transfer and assign any and all of the Liquidating Trust Assets and to take all actions necessary to effectuate the same and to prosecute any and all Retained Causes of Action; and (c) as of the Effective Date, the Liquidating Trust Assets will be free and clear of all liens, claims and interests of Holders of Claims and Interests, except as otherwise provided in the Plan.

F.    **Dissolution of the Debtors; Termination of Current Officers, Directors, Employees and Counsel**

From and after the Effective Date, the Debtors shall be dissolved and the Liquidating Trustee shall be authorized to take all action necessary to dissolve them or any of their wholly owned subsidiaries.  On the Effective Date, the employment, retention, appointment and authority of all officers, directors, employees and Professionals of the Debtors and the Creditors' Committee shall be deemed to terminate.

G.    **Liquidating Trust**

1.    *Effectiveness of the Liquidating Trust*

On the Effective Date, the Liquidating Trust Agreement will become effective, and, if not previously signed, the Debtors and the Liquidating Trustee will execute the Liquidating Trust Agreement.  The Liquidating Trust is organized and established as a trust for the benefit of the Beneficiaries, and is intended to qualify as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d).

2.      *Beneficiaries*

In accordance with Treasury Regulation Section 301.7701-4(d), the Beneficiaries of the Liquidating Trust will be the Holders of all Allowed Claims against the Debtors.  The Holders of Allowed Claims will receive an allocation of the respective Liquidating Trust Interests as provided for in the Plan and the Liquidating Trust Agreement.  The Holders of Liquidating Trust Interests will receive Distributions from the Liquidating Trust as provided for in the Plan and the Liquidating Trust Agreement.  The Beneficiaries shall be treated as the grantors and owners of such Beneficiaries' respective portions of the Liquidating Trust.

3.      *Implementation of the Liquidating Trust*

The proposed form of the Liquidating Trust Agreement, which shall identify the proposed Liquidating Trustee, will be filed as **Exhibit 1** to the Plan Supplement at least five (5) Business Days prior to the Balloting Deadline.  On the Effective Date, the Debtors, on behalf of the Estates, and the Liquidating Trustee shall execute the Liquidating Trust Agreement, which shall be substantially in the form attached to the Plan Supplement, and take all such actions that are required to transfer the Retained Assets to the Liquidating Trust.  From and after the Effective Date, the Liquidating Trustee will be authorized to, and shall, implement the Liquidating Trust Agreement and the provisions of the Plan as are contemplated to be implemented by the Liquidating Trustee, including, without limitation, directing Distributions to Holders of Allowed Claims, objecting to Claims, prosecuting or otherwise resolving Retained Causes of Action and causing Distributions from the Liquidating Trust to be made to the Beneficiaries.

4.      *Transfer of the Retained Assets*

Unless otherwise expressly provided under the Plan, on the Effective Date, the Retained Assets will vest in the Liquidating Trust free and clear of all claims, liens, encumbrances, charges and other interests.  To the extent required to implement the transfer of the Retained Assets to the Liquidating Trust as provided for herein, all Entities and Persons shall cooperate with the Plan Proponents and the Estates to assist the Debtors and the Estates to implement the transfers.

5.      *Representative of the Estate*

The Liquidating Trustee will be appointed as the representative of each of the Estates pursuant to sections 1123(a)(5), (a)(7) and (b)(3)(B) of the Bankruptcy Code and vested with the authority and power (subject to the Liquidating Trust Agreement) to, *inter alia*, (a) object to Claims against, and Interests in, the Debtors; (b) administer, investigate, prosecute, settle and abandon all Retained Causes of Action assigned to the Liquidating Trust; (c) make Distributions provided for in the Plan, including, but not limited to, on account of Allowed Claims; and (d) take such action as required to administer, wind-down and close the Chapter 11 Cases.  As the representative of the Estates, the Liquidating Trustee will succeed to all of the rights and powers of the Debtors, the Estates, the Creditors' Committee and any party in interest that may act derivatively in a fiduciary capacity for the benefit of the Estates with respect to all Retained Causes of Action assigned and transferred to the Liquidating Trust, and the Liquidating Trustee will be substituted for the Debtors, the Estates, the Creditors' Committee and any such fiduciary, as applicable, as the party in interest in all litigation pending on the Effective Date concerning the

Retained Causes of Action.

### 6. *No Liability of Liquidating Trustee or Post-Effective Date Creditors' Committee*

To the maximum extent permitted by law, the Liquidating Trustee, its employees, officers, directors, agents, members or representatives, or professionals employed or retained by the Liquidating Trustee (collectively, the "**Liquidating Trustee's Agents**") will not have or incur liability to any Person or Entity for an act taken, or omission made, in good faith in connection with or related to Distributions made under the Plan or the Liquidating Trust Agreement, the administration of the Liquidating Trust and the implementation of the Plan. The Liquidating Trustee and the Liquidating Trustee's Agents will in all respects be entitled to reasonably rely on the advice of counsel with respect to their duties and responsibilities under the Plan and the Liquidating Trust Agreement. Notwithstanding the foregoing, nothing herein or in Article VIII of the Plan will alter any provision in the Liquidating Trust Agreement that provides for the potential liability of the Liquidating Trustee to any Person or Entity.

### 7. *The Creditors' Committee*

Until the Effective Date, the Creditors' Committee shall continue in existence. As of the Effective Date, the Creditors' Committee shall terminate and disband and the members of the Creditors' Committee and the Creditors' Committee shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from their service as Creditors' Committee members.

### 8. *Funding of Post-Effective Date Expenses*

All expenses related to implementation of the Plan incurred from and after the Effective Date will be expenses of the Liquidating Trust, and the Liquidating Trustee will disburse funds from the Liquidating Trust Assets for purposes of paying the Post-Effective Date Expenses of the Liquidating Trust without the need for any further order of the Bankruptcy Court.

### 9. *Provisions Relating to Federal Income Tax Compliance*

A transfer to the Liquidating Trust shall be treated for all purposes of the Internal Revenue Code of 1986, as amended (the "**Internal Revenue Code**"), as a transfer to creditors to the extent creditors are Beneficiaries of the Liquidating Trust. For example, such treatment shall apply for purposes of Internal Revenue Code sections 61(a)(12), 483, 1001, 1012 and 1274. Any such transfer shall be treated for federal income tax purposes as a deemed transfer to the beneficiary-creditors followed by a deemed transfer by the beneficiary-creditors to the Liquidating Trust. The Beneficiaries of the Liquidating Trust shall be treated for federal income tax purposes as the grantors and deemed owners of the Liquidating Trust.

### H. **Provisions Governing Distributions**

### 1. *Disbursing Agent*

The Liquidating Trustee shall serve as the Disbursing Agent under the Plan or select

another Entity to serve as the Disbursing Agent.  Any Entity other than the Liquidating Trustee that acts as the Disbursing Agent for the Liquidating Trust will be an agent of the Liquidating Trustee and not a separate taxable Entity with respect to, among other things, the assets held, income received or disbursements or Distributions made for the Liquidating Trustee.  If ordered to by the Bankruptcy Court, the Liquidating Trustee will provide a bond in connection with the making of any Distributions pursuant to the Plan.

The Disbursing Agent shall make all Distributions required under the Plan.  The Disbursing Agent, if not the Liquidating Trustee, shall be authorized, after consultation with the Liquidating Trustee, to implement such procedures as it deems necessary to make Distributions pursuant to the Plan so as to efficiently and economically ensure prompt and proportionate Distributions.

2. *The Source of Distributions*

The sources of all Distributions and payments under the Plan, the Global Settlement Agreement and the Liquidating Trust Agreement will be the Retained Assets, which shall include (a) Cash, which will be Cash transferred to the Liquidating Trust as of the Effective Date of the Plan and (b) proceeds from the liquidation by the Liquidating Trust of the Retained Assets (including the prosecution of the Retained Causes of Action) that were transferred to the Liquidating Trust less Post-Effective Date Expenses.

3. *Distribution Dates*

The Distribution Dates for the Distribution of Cash by the Liquidating Trust shall be selected by the Liquidating Trustee.

4. *Manner of Cash Payments*

Cash Distributions made pursuant to the Plan will be in United States funds, by check drawn on a domestic bank, or, if the Liquidating Trustee so elects in its discretion for Distributions to certain large claimants, by wire transfer from a domestic bank.

5. *Setoff and Recoupment*

Notwithstanding anything to the contrary in the Plan, the Liquidating Trustee may set off, recoup or withhold against the Distributions to be made on account of any Allowed Claim or Cause of Action, any Claims or Retained Causes of Action that the Debtors or the Estates may have against the Entity holding the Allowed Claim or Cause of Action.  The Debtors, the Estates and the Liquidating Trust shall not waive or release any Claim or Retained Cause of Action against such Entities by failing to effect such a setoff or recoupment, by failing to assert any such matter prior to Confirmation or the Effective Date, by allowing any Claim or Retained Cause of Action against the Debtors or the Estates or by making a Distribution on account of an Allowed Claim or Cause of Action.

6. *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in a Final Order, the Plan or the Confirmation Order, or required by applicable law, postpetition interest shall not accrue or be paid on any

prepetition Claims against the Debtors, and no Holder of a prepetition Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such prepetition Claim.

### 7. *Foreign Currency Exchange Rate*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal*, National Edition, on the Effective Date.

### 8. *Claims Paid by Third Parties*

The Plan Proponents or the Liquidating Trustee, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claim objection having to be Filed and without any further notice or any action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or the Liquidating Trust. Subject to the last sentence of this paragraph, to the extent that a Holder of a Claim receives a Distribution on account of such Claim and receives payment from a party that is not a Debtor or the Liquidating Trust on account of such Claim, such Holder shall, within two (2) weeks of receipt thereof, repay or return the Distribution to the Liquidating Trustee, to the extent that the Holder's total recovery on account of such Claim from the third-party and under the Plan exceeds the amount of such Claim as of the date of any such Distribution under the Plan. The failure of such Holder to timely repay or return such Distribution shall result in the Holder owing the Liquidating Trust annualized interest at the federal judgment interest rate in effect as of the Petition Date (calculated as set forth in section 1961 of the Judicial Code) on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

### 9. *Claims Payable by Third Parties*

No Distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection to such Claim having to be Filed and without any further notice or any action, order or approval of the Bankruptcy Court.

### 10. *No De Minimis Distributions*

Notwithstanding anything to the contrary in the Plan, no Distribution of less than $50.00 will be made to any Holder of an Allowed Claim on account thereof. No consideration will be provided in lieu of the de minimis Distributions that are not made under Article V.I.10 of the Plan.

### 11. *Fractional Cents*

When any payment of a fraction of a cent would otherwise be called for, the actual payment will reflect a rounding of such fraction to the nearest whole cent (rounding down in the case of less

than $0.005 and rounding up in the case of $0.005 or more); **provided**, **however**, that, in no event will the Liquidating Trustee make a Distribution of less than $50.00 to any Holder of an Allowed Claim.

### 12.    *No Distributions with Respect to Disputed Claims*

Notwithstanding any other Plan provision, Distributions will be made on account of a Disputed Claim only after, and only to the extent that, the Disputed Claim either becomes or is deemed to be an Allowed Claim for purposes of Distributions.

### 13.    *Undeliverable or Unclaimed Distributions*

Distributions to Entities holding Allowed Claims will initially be made by mail as follows: (a) Distributions will be sent to the address, if any, set forth on a Filed Proof of Claim (as amended by any written notice of address change received by the Debtors prior to the Effective Date or the Liquidating Trustee no later than 10 Business Days prior to the date of any Distribution); or (b) if no such address is available, Distributions will be sent to the address (i) set forth on the Schedules or (ii) readily obtainable by a cursory review of the Debtors' other books and records. If neither (a) or (b) above provide the Liquidating Trustee with an address for the Holder of an Allowed Claim, the Distribution will be deemed to be undeliverable. If a Distribution is returned to the Liquidating Trustee as an undeliverable Distribution or is deemed to be an undeliverable Distribution, the Liquidating Trustee will make no further Distributions to the Holder of the Claim on which the Distribution is being made.

Any Entity entitled to an undeliverable Distribution that does not, within 45 days after a Distribution is returned as undeliverable, provide the Liquidating Trustee with written notice (a) asserting its Claim to or Interest in the undeliverable Distribution and (b) setting forth a current, deliverable address will be deemed to waive any claim to or interest in the undeliverable Distribution and will be forever barred from receiving the undeliverable Distribution or asserting any Claim against the Debtors, the Estates, the Liquidating Trust or each of the foregoing party's property. Any undeliverable Distributions that are not claimed hereunder will be distributed Pro Rata to other Holders of Allowed Claims in the same respective Class as the Holder of the undeliverable Distribution. Nothing herein requires the Liquidating Trustee to attempt to locate any Person or Entity holding an Allowed Claim whose Distribution is undeliverable.

### 14.    *Record Date*

Unless a notice of transfer of Claim or Interest has been filed with the Bankruptcy Court prior to the Record Date in accordance with Bankruptcy Rule 3001, the Disbursing Agent will rely on the Claims Register when determining Holders on the Record Date.

## I.    **Exculpation**

As of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan, to the maximum extent permitted by applicable law, none of the Exculpated Parties shall have or incur liability to one another or against any Holder of a Claim or an Interest, or any other party in interest, or any of their respective officers, directors, shareholders, members and/or enrollees, employees, representatives, advisors, attorneys, financial

advisors, investment bankers, agents, related professionals or affiliates, or any of their successors or assigns, for any act or omission occurring or failing to occur after the Petition Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the negotiation and execution of the Plan, the Disclosure Statement, the Liquidating Trust Agreement, the Asset Purchase Agreement, the related sale process, the solicitation of votes for and the pursuit of confirmation of the Plan, the consummation of the Plan, including all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto, except fraud, willful misconduct or gross negligence as determined by a Final Order.

As of the Effective Date and subject to the occurrence of the Effective Date, notwithstanding any other provision of the Plan, neither any Holder of a Claim or Interest, nor other party in interest, nor any of their respective officers, directors, shareholders, members and/or enrollees, employees, representatives, advisors, attorneys, financial advisors, investment bankers, related professionals, agents or affiliates, and no successors or assigns of the foregoing, shall have any right of action against any of the Exculpated Parties for any act or omission occurring or failing to occur after the Petition Date through the Effective Date in connection with, relating to, or arising out of, the Chapter 11 Cases, the negotiation and execution of the Plan, the Disclosure Statement, the Liquidating Trust Agreement, the Asset Purchase Agreement, the sale process, the solicitation of votes for and the pursuit of confirmation of the Plan, the management of the Liquidating Trust, the liquidation of the Liquidating Trust Assets, the consummation of the Plan, the administration of the Plan, and/or the property to be distributed under the Plan, including all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto, except fraud, willful misconduct or gross negligence as determined by a Final Order.

For the avoidance of doubt:  (a) nothing in Article VII.B of the Plan shall limit or abrogate the obligations of the Debtors or the Purchaser and any of their respective Affiliates under the Asset Purchase Agreement; (b) nothing in the Plan is intended to limit, modify, reverse or otherwise alter the express findings and conclusions made in the orders and opinions of the Bankruptcy Court approving the Asset Purchase Agreement or the Debtors' authority to borrow or use cash collateral, including, without limitation, the DIP Order and the Sale Order; and (c) nothing in the Plan or Confirmation Order shall release or exculpate any term of the Netflix Settlement and provided further that the Netflix Agreements (as defined in the Netflix Settlement) remain in full force and effect with respect to the Parties' (as defined in the Netflix Settlement) performance and obligations thereunder following the date of the Netflix Settlement.

## J.    **Injunction**

As of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons who have held, hold or may hold Claims or Interests based upon any act or omission, transaction or other activity of any kind or nature related to the Debtors, the Liquidating Trust or the Chapter 11 Cases that occurred prior to the Effective Date, other than as expressly provided in the Plan or the Confirmation Order, regardless of the Filing, lack of Filing, Allowance or disallowance of such Claims or Interests and regardless of whether such Person has voted to accept the Plan, and any successors, assigns or representatives of such Persons, shall be precluded and permanently enjoined on and after the Effective Date from (a) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order with respect to any

such Claims or Interests against the Retained Assets or the Purchased Assets and (b) the creation, perfection or enforcement of any Lien or encumbrance of any kind with respect to any such Claims or Interests against the Retained Assets or the Purchased Assets. Nothing in Article VII.C of the Plan shall be construed as an injunction with respect to the Liquidating Trustee's pursuit of the Retained Causes of Action transferred to the Liquidating Trust on the Effective Date.

As of the Effective Date and subject to the occurrence of the Effective Date, except as otherwise specifically provided in the Plan or the Confirmation Order, all Persons that have held, currently hold, or may hold, against any Exculpated Party, a claim, obligation, suit, judgment, demand, damages, debt, right, cause of action, or liability that is exculpated pursuant to the Plan, are permanently enjoined from taking any of the following actions on account of such claim, obligation, suit, judgment, damages, demand, debt, right, cause of action or liability: (i) commencing or continuing, in any manner or in any place, any suit or other proceeding; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting or enforcing any Lien or encumbrance; or (iv) asserting a setoff, right of subrogation or recoupment against any debt, liability or obligation due to any Exculpated Party.

### K.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extent on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### L.    Miscellaneous Provisions

#### 1.    *No Impact on Certain Documents and Transactions*

Unless explicitly provided for in the Plan, nothing in the Plan shall impact (or be construed as impacting): (a) the Sale Order, (b) the Asset Purchase Agreement, (c) the Global Settlement Agreement; (d) the Netflix Settlement and (e) any document or transaction entered into in connection with the foregoing (a)-(d).

#### 2.    *Modification and Amendments*

Subject to certain restrictions and requirements set forth in the Plan, section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Proponents expressly reserve their respective rights to revoke or withdraw, to alter, amend, or modify the Plan with respect to such Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

3.      *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

4.      *Revocation or Withdrawal of Plan*

The Plan Proponents reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans. If the Plan Proponents revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of the Claims or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claims, Interests, or Causes of Action; (ii) prejudice in any manner the rights of such Debtor, any holder, or any other Entity; or (iii) constitute an admission, acknowledgement, offer or undertaking of any sort by such Debtor, any holder of a Claim or Interest, or any other Entity; **provided**, **however**, that neither the Debtors' revocation or withdrawal of the Plan nor the non-occurrence of Confirmation or Consummation shall have an impact on the Sale Order or the Purchaser's purchase of the Purchased Assets.

5.      *Retention of Jurisdiction*

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

a.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status or amount of any Claim or Interest, including the resolution of any request for the payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount or allowance of Claims;

b.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for Allowance of compensation or reimbursement of expenses to Professionals (including Professional Fee Claims) authorized pursuant to the Bankruptcy Code or the Plan;

c.      resolve any matters related to: (a) the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation

under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned, except with respect to the Netflix Contracts; (c) the Liquidating Trustee, after the Effective Date and in accordance with Article IX of the Plan, amending, modifying or supplementing the Executory Contracts and Unexpired Leases to be assumed or rejected; and (d) any dispute regarding whether a contract or lease is or was executory, expired or terminated;

d.      ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

e.      adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

f.      adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

g.      enter and implement such orders as may be necessary or appropriate to execute, implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Plan Supplement or the Disclosure Statement;

h.      enter and enforce any order for the sale of property pursuant to sections 363, 1123 or 1146(a) of the Bankruptcy Code;

i.      resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with Consummation, including interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

j.      issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

k.      resolve any cases, controversies, suits, disputes or Causes of Action with respect to the injunctions and other provisions contained in Article VIII of the Plan, and enter such orders as may be necessary or appropriate to implement such injunctions and other provisions;

l.      resolve any cases, controversies, suits, disputes or Causes of Action with respect to the repayment or return of Distributions and the recovery of additional amounts owed by a Holder for amounts not timely repaid pursuant to Article V.I.8 of the Plan;

m.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

n.    determine any other matters that may arise in connection with or that relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan or the Disclosure Statement;

o.    enter an order or final decree concluding or closing any of the Chapter 11 Cases;

p.    adjudicate any and all disputes arising from or relating to Distributions under the Plan;

q.    consider any modifications of the Plan, cure any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

r.    determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

s.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan;

t.    hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

u.    hear and determine all disputes involving the existence, nature, scope or enforcement of any exculpations, injunctions and releases granted in connection with and under the Plan, including under Article VIII of the Plan;

v.    enforce all orders previously entered by the Bankruptcy Court; and

w.    hear any other matter not inconsistent with the Bankruptcy Code, including any Retained Causes of Action.

6.    *Successors and Assigns*

The rights, benefits and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries or guardian, if any, of each Entity or Person.

61

7.    *Non-Severability of Plan Provisions*

The provisions of the Plan, including, but not limited to, its injunction, exculpation and compromise provisions, are mutually dependent and non-severable. The Confirmation Order shall constitute a judicial determination and provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Liquidating Trustee consistent with the terms set forth herein; and (c) non-severable and mutually dependent.

8.    *Substantial Consummation*

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code; **provided**, **however**, that nothing herein shall prevent the Plan Proponents or any other party in interest from arguing that substantial consummation of the Plan has occurred prior to the Effective Date.

9.    *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control. In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control. Notwithstanding the foregoing, to the extent any provision of the Plan or the Confirmation Order is inconsistent with (a) the Sale Order concerning any matter relating to the Purchased Assets, the Sale Order shall govern and control or (b) the Netflix Settlement concerning any matter set forth therein, the Netflix Settlement shall govern and control.

## XI.    RISK FACTORS

Parties in interest should read and carefully consider the following risk factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.

### A.    <u>Claim Objections</u>

Although Holders of certain Claims may not be required to file Proofs of Claim, the Debtors may object to a Proof of Claim Filed by or on behalf of a Holder of a Claim, except where otherwise indicated in the Plan. The Distribution estimates set forth in this Disclosure Statement are not applicable to any Holder of any Claim whose Claim is or may be subject to an objection. Any such Holder may not receive its specified share of the estimated Distributions described in this Disclosure Statement.

B.    **Distributions**

While the Plan Proponents have endeavored to project what they believe are likely Distributions, if any, to be made to parties holding Allowed Claims, there can be no certainty that the projections will be accurate and that Holders will receive the Distributions described in the Plan. The projections will necessarily be affected by, among other things: (a) recoveries that the Liquidating Trustee generates from the Causes of Action; (b) recoveries that the Liquidating Trustee generates in connection with the liquidation of all of the other Retained Assets; (c) the outcome of objections to Claims; and (d) the cost and expenses of such actions and generally administering the Liquidating Trust.

C.    **Non-Confirmation of Plan**

Although the Plan Proponents believe that the Plan will satisfy all of the requirements necessary for Confirmation in accordance with the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications will not necessitate the re-solicitation of votes. Finally, there can be no assurances that the Plan will receive sufficient votes for Confirmation.

The Bankruptcy Code requires that a plan comply with certain requirements (including, but not limited to, the requirements of section 1129 of the Bankruptcy Code) in order to be confirmed. The Bankruptcy Court may determine that one or more of those requirements is not satisfied with respect to the Plan. If the Bankruptcy Court makes such a determination, the Plan Proponents could be required to restart the solicitation process and (i) seek approval of a new disclosure statement, (ii) solicit or re-solicit votes from Holders of Claims or Interests and/or (iii) seek confirmation of a newly proposed plan. Additionally, should the Plan fail to be approved, confirmed or consummated, non-Debtor parties-in-interest may be in a position to file alternative plans pursuant to section 1121 of the Bankruptcy Code. As such, non-confirmation of the Plan would likely entail significantly greater risk of delay, expense and uncertainty to the Debtors and their Estates.

D.    **Administrative Insolvency**

Section 1129(a)(9)(A) of the Bankruptcy Code states that in order for the Plan to be confirmed, it must provide that each Holder of an Allowed Claim brought under section 507(a)(2) or 507(a)(3) of the Bankruptcy Code—*i.e.*, Allowed Administrative Expense Claims—receive cash equal to the full Allowed amount of such Claim, unless such Holder agrees to different treatment. Additionally, section 1129(a)(9)(C) of the Bankruptcy Code states that in order for the Plan to be confirmed, it must provide that each holder of an Allowed Claim entitled to priority under section 507(a) of the Bankruptcy Code—*i.e.*, Allowed Priority Tax Claims—receive regular installment payments in cash of a total value equal to the Allowed amount of such Claim over a period ending not later than five (5) years after the Petition Date, and in a manner that is not less favorable than the most favored nonpriority unsecured claim under the Plan. Finally, Other Priority Claims may similarly be required to receive a certain treatment under section 1129(a)(9) of the Bankruptcy Code (such as cash equal to the full Allowed amount of such Claim).

The Plan Proponents presently believe that they have sufficient cash to pay all Administrative Expense Claims, Priority Tax Claims and Other Priority Claims that they anticipate will be Allowed by the Bankruptcy Court, and/or that they can reach agreements with Holders of such Claims as to different treatments of such Claims.    However, if the Debtors are administratively insolvent, the Bankruptcy Court may not confirm the Plan and the Bankruptcy Court may convert the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, either or both of which would likely entail significantly greater risk of delay, expense and uncertainty to the Debtors and their Estates, as noted above in Article IX.B of this Disclosure Statement.

### E.    Amendment, Waiver, Modification or Withdrawal of Plan

Under certain circumstances, the Plan Proponents may, prior to Confirmation or substantial consummation of the Plan and subject to the provisions of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019 and the Plan, amend the terms of the Plan or waive any conditions thereto, if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the Holders of Claims cannot presently be foreseen, but may include a change in the economic impact of the Plan on some or all of the Classes or a change in the relative rights of such Classes.

### F.    Non-Occurrence or Delayed Occurrence of the Effective Date

Although the Plan Proponents believe that the Effective Date will occur within thirty (30) days after the Confirmation Date following satisfaction of any applicable conditions precedent, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date described in Article V.B of the Plan have not occurred or otherwise been waived by the date that is 30 days after entry of the Confirmation Order, then the Confirmation Order will be vacated.  Under such circumstances, no Distributions would be made under the Plan, the Debtors and all Holders of Claims and Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### G.    Conversion to Chapter 7 Case

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of creditors and/or the Debtors, the Chapter 11 Cases may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Plan Proponents believe that liquidation under chapter 7 would result in smaller distributions being made to the Debtors' creditors than those provided for in the Plan, as further detailed in Article IX.B of this Disclosure Statement.

## XII.    FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN

The following is a summary of certain United States federal income tax consequences of the Plan to the Debtors and certain holders of Allowed Claims.  This summary is based on the Internal Revenue Code, the Treasury Regulations thereunder (the "**Treasury Regulations**") and administrative and judicial interpretations, all as in effect on the date of this Disclosure Statement

and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling from the Internal Revenue Service as to any of the tax consequences of the Plan discussed below. There can be no assurance that the Internal Revenue Service will not challenge one or more of the United States federal income tax consequences of the Plan described below.

This summary does not apply to holders of Allowed Claims that are not United States persons, as such term is defined in the Internal Revenue Code, or that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, foreign (*i.e.*, non-United States) persons, brokers and dealers in securities, mutual funds, small business investment companies, persons holding Allowed Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction and regulated investment companies). Moreover, this summary does not purport to cover all aspects of United States federal income taxation that may apply to the Debtors and Holders of Allowed Claims based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local or foreign tax law.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF ALLOWED CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

### A.    <u>Certain United States Federal Income Tax Consequences to the Debtors</u>

Under the Internal Revenue Code, a taxpayer generally recognizes cancellation of debt income ("**CODI**") to the extent that indebtedness of the taxpayer is cancelled for less than the amount owed by the taxpayer, subject to certain judicial or statutory exceptions. The most significant of these exceptions with respect to the Debtors is that taxpayers who are operating under the jurisdiction of a federal bankruptcy court are not required to recognize such income. In that case, however, the taxpayer must reduce its tax attributes, such as its net operating losses, general business credits, capital loss carryforwards, and tax basis in assets, by the amount of the CODI avoided. In this case, the Debtors expect that it may recognize significant CODI from the implementation of the Plan. As a result, the Debtors expect that its tax attributes may be reduced on account of such CODI. However, because the Debtors intend to liquidate, any remaining net operating losses or other tax attributes will have no ongoing value to the Debtors or to the Holders of Allowed Claims.

B.    **Consequences to Holders of Certain Claims**

1.    *Distributions by the Debtor*

As previously described, the Liquidating Trustee will, among other things, resolve Disputed Claims and investigate and pursue the Retained Causes of Action.  The Retained Causes of Action will be transferred to the Liquidating Trust.  Thereafter, the Liquidating Trustee will make Distributions to Holders of Allowed Claims of Cash, and Holders will obtain the rights to receive any additional amounts recovered by the Liquidating Trust with respect to the Retained Causes of Action.  Each Holder of an Allowed Claim generally will recognize income, gain or loss for United States federal income tax purposes in an amount equal to the difference between (a) the amount of Cash received and the fair market value of such Holder's rights to Distributions from the Liquidating Trust that such Holder is deemed to receive in exchange for its Claim, and (b) such Holder's adjusted United States federal income tax basis in its Claim.  The character of such income, gain, or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, the nature of such Holder's Claim, whether the Claim constitutes a capital asset in the hands of the Holder, whether the Claim was purchased at a discount, whether the Claim is extinguished as a result of the Distribution and whether and to what extent the Holder has previously claimed a bad debt deduction with respect to its Claim.  A Holder's ability to deduct any loss recognized on a deemed exchange of its Claim will depend on such Holder's own circumstances and may be restricted under the Internal Revenue Code.

2.    *Treatment of the Liquidating Trust*

Pursuant to the Plan, on the Effective Date, the Debtors will establish the Liquidating Trust (to be administered by the Liquidating Trustee pursuant to the Liquidating Trust Agreement) and transfer the Retained Assets to the Liquidating Trust.  In addition, the Liquidating Trust will be treated as a grantor trust.  As such, each Holder of an Allowed Claim will be treated as the beneficial owner of that portion of the assets of the Liquidating Trust corresponding to the portion of any Distributions from the Liquidating Trust (from recoveries with respect to Retained Causes of Action) which such Holder would be entitled to receive (commonly referred to for United States federal income tax purposes as such Holder's "beneficial ownership percentage" in the Liquidating Trust).

Subject to various limitations and special rules, the taxable income of the Liquidating Trust each year would be allocated among the Holders of Allowed Claims in accordance with their respective beneficial ownership percentages in the Liquidating Trust.  Until there has been a final determination of the amount of any Distributions from the Liquidating Trust to which each Holder of an Allowed Claim would be entitled, each such Holder's allocable share of the Liquidating Trust's taxable income may be unclear.  Cash Distributions by the Liquidating Trust to Holders of Allowed Claims would not be treated as additional taxable income.  However, there would be no assurance that Cash Distributions by the Liquidating Trust to the Holders of Allowed Claims would correspond to the allowed taxable income in any particular year.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE**

66

**EXCHANGE OF ALLOWED CLAIMS FOR DISTRIBUTIONS FROM THE DEBTOR AND THE POSSIBLE ALLOCATION OF TAXABLE INCOME FROM THE LIQUIDATING TRUST.**

1.     *Accrued Interest*

A portion of the consideration received by Holders of Allowed Claims may be attributable to accrued interest on such Claims.  Such amounts should be taxable to that Holder as interest income if such accrued interest has not been previously included in such Holder's gross income for United States federal income tax purposes.  Conversely, Holders of Allowed Claims may be able to recognize a deductible loss to the extent any accrued interest on the Claims was previously included in such Holder's gross income but was not paid in full by the Debtor.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest on Allowed Claims, the extent to which such consideration will be attributable to accrued interest is unclear.  Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest that accrued on such Claims, if any.  Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for United States federal income tax purposes, while certain Treasury Regulations generally treat payments as allocated first to any accrued but unpaid interest and then as a payment of principal.  The Internal Revenue Service could take the position that the consideration received by the Holder should be allocated in some way other than as provided in the Plan.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE UNITED STATES FEDERAL INCOME TAX TREATMENT OF ACCRUED INTEREST.**

1.     *Market Discount*

Under the "market discount" provisions of the Internal Revenue Code, some or all of any gain realized by a Holder of a Claim on the taxable exchange of such Claim as described above may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired by the Holder other than on original issue and if such Holder's adjusted United States federal income tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable exchange of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were

considered to be held by such Holder (unless such Holder elected to include market discount in income as it accrued).

### 2. *Information Reporting and Backup Withholding*

In general, information reporting requirements may apply to Distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to Distributions or payments made pursuant to the Plan unless such Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally on Form W-9). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the Holder to the extent that it results in an overpayment of tax; **provided; however,** that the required information is timely provided to the Internal Revenue Service.

The Debtors, the Liquidating Trust, or the applicable withholding agent will withhold all amounts required by law to be withheld from payments of interest. The Debtors and the Liquidating Trust will comply with all applicable reporting requirements of the Internal Revenue Service.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE LIQUIDATION, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

### XIII. RECOMMENDATION AND CONCLUSION

The Plan Proponents believe that the confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Plan Proponents urge all parties entitled to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received by the Voting Agent on or before the Voting Deadline.

Dated:    December 13, 2018
New York, NY

By: */s/ Colin M. Adams*
_____
Colin M. Adams
*Chief Restructuring Officer to the Debtors and Debtors in Possession*